Jacob Markowitz, J.
The Attorney-General of the State of New York moves to confirm in part and to modify in part the report of the Referee appointed by this court to hear and report on the questions presented in this proceeding, and for such other and additional relief as the court may deem necessary. Cross motions by the American Chemical Society (hereinafter referred to as the “Society”), and by petitioner seek to confirm the Referee’s report, except insofar as it denies petitioner’s claim for compensation in certain respects.
In the Spring of 1956, petitioner, Guaranty Trust Company of New York, (hereinafter referred to as “Guaranty”), applied for an order (1) authorizing it, as trustee of the Petroleum Research Fund, a charitable trust, to sell all or part of the securities of Universal Oil Products Company (hereinafter referred to as “Universal”), which constitute substantially aE the corpus of the trust, When and if petitioner shaE in its discretion determine it advisable,” and (2) authorizing it to retain 10% of the proceeds of the sale as its compensation for aE services theretofore rendered and thereafter to be rendered up to the date of completion of the sale, said 10% to be in addition to the compensation annuaEy retained by petitioner during the period of the trust.
It is important at this point, to summarize the provisions of the trust. The corpus transferred to Guaranty on October 26, 1944 by the original donors, six major oil companies, consisted of most of the issued outstanding stock and notes of Universal. On or about November 22, 1944, aE the remaining stock and outstanding notes of Universal were added to the corpus by the Society, which had received them as a gift from another major oil company. As the result, the corpus included all the issued and outstanding stock of Universal. Except for some United States Government bonds, obtained from the investment of the proceeds of certain Universal securities, the corpus at the present time stiE consists solely of aE the outstanding stock of Universal and of aE the debentures issued by it (in a recapitaEzation) in Eeu of its notes, previously mentioned.
*306 The trust agreement characterizes its purposes as “ charitable, scientific and educational It provides that the trust shall be known as ‘ ‘ The Petroleum Research Fund ’ ’ and, subject to the provisions of article fourth, that the trust shall continue in perpetuity. The funds distributed by the trustee are to be used by the recipient “ exclusively for advanced scientific education and fundamental research in the ‘ petroleum field ’, which may include any field of pure science which in the judgment of the recipient may afford a basis for subsequent research directly connected with the petroleum field ” (italics supplied). “ Such education and research may include the exchange of scientists and university scientific students between American and foreign non-profit scientific or educational institutions * * * and services incidental to fundamental research such as the translation of scientific literature relating to the petroleum field.” All patents taken out by or in behalf of the recipient of the trust fund or by or on behalf of those acting for it or at its direction are to be dedicated to the public, royalty free. No funds paid by the trustee are to be used by the recipient except for trust purposes. The object of the agreement is declared to be “ to create a trust to advance the public welfare in accordance with the laws of the State of New York relating to charitable trusts.” There is an express provision that ‘ no part of the principal or income of the Trust Fund shall at any time be used for private profit or benefit.” The beneficiary of the trust, which is to be the recipient of the trust income, is the American Chemical Society or any successor thereof which shall undertake to carry on substantially all its activities in the field of scientific research and education. If and when the Society shall cease to be operated exclusively for charitable, scientific or educational purposes (with no part of its net earnings inuring to private shareholders or individuals, and with no substantial part of its activities consisting of attempts to influence legislation) it is to be supplanted as the recipient of the trust income, i.e., as beneficiary, by a corporation or foundation which meets said requirements.
Article fourth of the trust agreement contains the following very important provision:
“ Universal is a corporation presently engaged primarily in research and development work in the petroleum field and the ownership and licensing of processes, patents and patent rights relating to the petroleum field. The Donors believe that the carrying on of such business is in the public welfare. It is, therefore, hereby provided that, anything in the other Articles *307 of this Agreement contained to the contrary notwithstanding, hut subject to the further provisions of this Article, the Trustee, unless and until it shall have been authorized or directed so to do by order of a court of competent jurisdiction, shall not
(a) sell or otherwise dispose of any of the securities of Universal at any time held by it hereunder, or
(b) cause or permit Universal to discontinue research and development work in the petroleum field and the ownership and licensing of processes, patents and patent rights relating to the petroleum field.
“It is the intention of this provision that the Trustee shall be relieved of the foregoing restrictions only in case it shall be demonstrated to a court of competent jurisdiction that conditions shall have changed in such manner and to such extent that the public welfare will be no longer effectively served by such restrictions.”
The trust thus had a dual purpose; (1) to promote, in the public welfare, advanced scientific education and fundamental research in the petroleum field ’ including any field of ‘ ‘ pure science ” relating thereto, through the use of the trust income for those purposes by the Society or any successor beneficiary, and (2) the trustee’s continued ownership of Universal and Universal’s continued operation in the research and development work which it was then conducting in the petroleum field (including the obtaining and licensing of processes and patents) until and unless changes of conditions should satisfy the court that the public welfare will no longer be effectively served by these restrictions. The importance of this second purpose was emphasized by the Appellate Division in this very case (Matter of Petroleum Research Fund, 3 A D 2d 1, 4), the court stating that the provisions of the trust agreement “clearly spell out a definitive intent, on the part of the donors, to perpetuate Universal’s services for the benefit of the refining industry * * * all of which they deem to be in the interest of the public welfare.” As will presently appear, the “fundamental research” and related activities of the recipient or beneficiary of the trust income, which are sought to be promoted by the trust, come within the field of pure science, whereas the operations of Universal, which are also sought to be encouraged, constitute applied science (the results of the fundamental or basic research conducted by others being applied to current industrial and commercial problems).
After Guaranty filed its original petition an order was made granting a motion by 13 independent oil companies to intervene, *308 which was affirmed by the Appellate Division (3 Mise 2d 790, mod. 3 A D 2d 1). Thereupon the Attorney-General and the Society, who had been served as parties, and the intervenors, interposed answers. The court appointed Louis M. Loeb, Esq. Referee to hear and report on the issues presented and the prayer of the petition was held in abeyance pending the return of the Referee’s report. Pursuant to stipulation the petitioner served and filed a supplemental petition with the Referee, qualifying its original prayer for authorization to sell all or part of Universal’s securities by imposing certain specified restrictions agreed upon by the intervenors, the Society and Guaranty. These restrictions were designed to ensure (1) as widespread dissemination as possible of the securities of Universal (in the interest of preventing their acquisition by any of the major oil companies or others who might operate Universal in a manner detrimental to the independent oil companies), (2) a contractual obligation to continue, for 10 years, Universal’s research and other activities and its policy of making its technique and know-how available to the petroleum industry, on a nondiscriminatory basis, and (3) the election of a named person as a board member. The Referee permitted the petitioner to modify its prayer for relief accordingly.
The Referee, according to his report, deemed the issues presented to him to be (1) whether a change of conditions had made it advisable, in the public welfare, to authorize the trustee to sell all or part of the Universal securities when and if the trustee thought it advisable, upon the conditions, however, which are set forth in the supplemental petition, (2) whether, if a sale should be authorized, Guaranty ought to be compelled to account to this court upon notice to the Attorney-General ; and (3) whether, if a sale be sanctioned by the court, Guaranty should receive 10% of the proceeds as compensation, over and above the compensation which it had retained for each year that the trust had been in existence.
, In a report, 53 printed pages in length, the learned Referee made the following recommendations:
(1) That the court enter an order authorizing Guaranty, when and if it determined it to be advisable, to sell all or part of the securities of Universal upon the terms and conditions set forth in the amended prayer;
(2) that if the court authorized a sale, that Guaranty should be directed to account to this court, upon notice to the Attorney-General, as soon as conveniently possible after the consummation of the sale, but in any event, within three years;
*309 (3) that Guaranty’s request for 10% of the sales price be denied, and that its compensation, over and above the payments of $50,000 annually received by it, be limited to “ a reasonable charge ” for services in connection with the “ possible ” sale of the securities, such charge to be included in its next annual account to the Society, or “ a reasonable charge ” for services in connection with an “ authorized ” sale, such charge to be included in the account directed to be made to the court after the consummation of such sale.
There is no opposition whatsoever to that part of the Referee’s report which recommends that, because of a change of conditions, it is in the public welfare that Guaranty be authorized to sell the securities of Universal on the conditions specified in the supplemental petition. However, suggestions have been made of a number of other qualifications, some of which will be presently referred to.
At the hearing of the motions now before the court, the latter’s suggestion that its action upon the issue of compensation await the outcome of a sale, if the court should authorize such sale, was approved by petitioner, the Society and the Attorney-General. All agreed that decision on the question of compensation be deferred and that the court, at this time, consider only the more urgent other questions.
The Referee, after 14 hearings, at which 1,309 pages of testimony were taken and numerous exhibits introduced into evidence, has found that, as the result of changed conditions since the creation of the trust, in October, 1944, (1) the public welfare will no longer be effectively served by continuing the restriction against a sale of Universal’s securities and (2) that the trustee’s prayer for authorization to sell them, subject to the conditions set forth in the supplemental petition, should be granted. Neither the Society nor the Attorney-General takes issue with the Referee’s conclusion. The intervenors likewise offer no opposition thereto. It is to be noted, however, that although the answer of the Attorney-General states that he has no objection to the granting of petitioner’s request for permission to sell the Universal securities (par. Second), the pleading concludes with a request that the court “find and determine whether the first prayer of the Petition should be granted in the light of the hereinbefore stated certification by the Attorney General that he has no objection thereto.” The affidavit submitted in support of the Attorney-General’s pending motion to confirm the report in certain respects states that his request for confirmation of the Referee’s recommendation *310 that a sale be authorized is made for the purpose of implementing recommendation No. 1 “so that this Court may make its own determination pursuant to the Fourth Article of the Agreement dated October 26, 1944 as to whether or not such a sale should be authorized” (italics the court’s). Even if the Attorney-General had unqualifiedly consented to the granting of permission to sell the Universal securities, without leaving it to the court to make the ultimate determination on the subject, the duty would nevertheless devolve upon the court to decide for itself whether or not the Referee’s recommendation is justified by the evidence and should be adopted. The instrument creating the trust declares it to be a trust for charitable, scientific and educational purposes ”, “to advance the public welfare in accordance with the laws of the State of New York relating to charitable trusts.” Article fifteenth expressly provides that “ the enforcement of the trust created by this agreement shall be vested in the Supreme Court of the State of New York.” The ultimate and prime beneficiaries of the trust are thus the members of the general public. It is obviously not feasible that they all be made parties to this proceeding so that they may have an opportunity to present their views. Although the Attorney-General is the statutory representative of the indefinite and uncertain beneficiaries of gifts and grants for éducational, benevolent and religious uses, the position taken by him is not conclusive upon this court. Enforcement of the trust is expressly vested in the court both by the trust agreement and by statute. Notwithstanding the fact that no opposition to the granting of authority to sell the Universal securities has been expressed or presented by any party to this proceeding, it is, therefore, nevertheless incumbent upon the court to decide for itself whether, by reason of changed conditions, the public welfare will be effectively served by such a sale. The court has, accordingly, been obliged to study the Referee’s report, the minutes of the hearings before the Referee, the exhibits introduced into evidence, and the briefs of the parties.
The Referee has found that there have been several kinds of changes in conditions, since the creation of the trust, which justify the lifting of the restriction in the trust agreement against the sale or disposal of the securities of Universal:
(1) a very substantial improvement in Universal’s financial condition;
(2) increased competition, in the fields to which Universal devotes itself, and the development by others of new processes, with the result that independent refining *311 companies are no longer as dependent upon Universal’s continued existence as they were in 1944; great increases in the cost of developing new processes, requiring large equity capital which Universal, while its stock is held by a trustee, cannot raise; and inability of Universal, while its stock is owned by a trustee, to adopt stock option and stock bonus plans which are necessary to furnish its personnel with the incentive required to obtain desirable results; and
(3) a change in the importance, from the standpoint of the public welfare, of fundamental or basic research in the petroleum industry, that being the use to which the trust income is to be applied by the Society.
The first change of conditions referred to by the Referee, viz.: the great improvement in Universal’s financial condition, does not, in the court’s opinion, furnish any justification whatever, as such, for authorizing a sale of its securities. Indeed, the betterment of Universal’s financial position would appear to be more of a reason for continuing its activities (which are not to be discontinued, according to the trust agreement, unless changes of conditions make it in the public welfare to permit discontinuance) than for permitting them to be reduced or given up as the result of the trustee’s loss of control through a sale of the stock. Universal’s financial improvement cannot properly constitute a justification, by itself, for the trustee’s divesting itself of its control over Universal, without ignoring the provision of article fourth that the trustee is not to cause or permit Universal to discontinue research and development work unless authorized to do so by a court order based upon changes of conditions making it for the public welfare to allow such discontinuation. (As will be pointed out presently, however, the vast appreciation in the value of Universal has a vital bearing upon the third change of conditions relied upon by the Referee.)
The second set of changed conditions relied upon by the Referee requires some elaboration. In 1944, at the time the trust was established, the independent oil companies were dependent, to a very substantial extent, upon Universal’s research and development work in the petroleum field and upon the licensing from Universal of the processes, patents, and patent rights acquired by it. Without the availability to them of the know-how and techniques developed by Universal, such *312 companies would have found it very difficult to compete with the major oil companies which, unlike the independents, possess financial resources large enough to enable them to do research work of their own. The importance of Universal to the petroleum research field is expressly recognized in the trust agreement, which declares that ‘ ‘ the Donors believe that the carrying on of such business is in the public welfare” (art. fourth) and enjoins the trustee not to cause or permit Universal to discontinue its activities in the petroleum field unless the court is persuaded that such course is in the public welfare as the result of changed conditions. Since 1944, however, Universal has faced a substantial growth in competition in connection with the licensing of refining processes in existence in 1944, and, in addition, it now has to meet competition in the licensing of new processes which were unknown at that time. Universal’s ability to raise the capital necessary to meet its growing financial demands is seriously hampered by the fact that its stock is trustee-owned. The testimony established that a sale of Universal’s stock would enable Universal to raise the. much needed equity capital required for the development of new processes and new methods of manufacturing. Another obstacle to Universal’s financial ability to remain on a par with its competitiors, while its sole stockholder is the trustee, is the fact that, to the extent that its earnings are ploughed back ino capital improvements, the beneficiary of the trust, the Society, is deprived of the trust income necessary to enable it to carry out “ the advanced scientific education and fundamental research ” to which the trust agreement requires the trust income to be applied. A sale of Universal’s stock by the trustee would eliminate this anomalous tug of war between the need of the trust income by Universal, to keep its competitive position, and the requirement of such income by the Society, for the purposes for which the trust agreement directs the income to be used. Another drag upon Universal’s continued ability to meet competition, while its stock remains in the hands of the trustee, is the difficulty of establishing stock option and stock bonus plans in order to give the outstanding members of its organization the incentive necessary to obtain their best efforts. This difficulty would be eliminated if the stock is sold and ceases to be trustee-held.
The second set of changed conditions, viz.: the decreased dependence of the refining industry upon Universal’s continued existence, as the result of increasing competition in the licensing of older processes and the development of new processes, with *313 Universal’s ability to keep up 'with, the competition gravely hampered by the fact that its stock is trustee-owned and subject to the requirements of the trust, is, in the court’s opinion, not sufficient, in and of itself, to sustain a finding that the public welfare will be effectively served by the trustee’s sale of the stock of Universal, which could well lead, sooner or later, to the discontinuance by Universal of the research and development work and licensing of processes and patents, activities which the donors of the trust considered ‘ ‘ in the public welfare A sale subject to the conditions provided for in the supplemental petition would only ensure the continuance of Universal’s present operations for a period of 10 years. However, the fact that all of the interveners (dependent as they have been and still are, to a greater or less extent, upon Universal’s continued existence) are willing to consent to a sale, on terms which would guarantee Universal’s continuance of its present operations and policies for only 10 years, is of some significance. The conditions of sale, added in the trustee’s supplemental petition in the interest of securing widespread public dissemination upon a sale of the securities, are reasonably calculated to prevent working control of Universal from falling into the hands of those whose interests might be opposed to the welfare of Universal’s customers and of Universal itself.
Although, as already observed, the circumstances referred to in connection with the second set of changed conditions relied upon by the Referee do not, standing by themselves, satisfy the court that the public welfare now requires a sale of Universal’s securities, they are factors to be considered together with the third set of changed conditions, presently to be discussed, in viewing the complete-picture and in weighing all the advantages and disadvantages, from the standpoint of the public welfare, of a sale upon the conditions proposed. The Referee’s report indicates that he likewise recognized that the second set of changed conditions would not, in itself, warrant approval of the request for authority to sell, and that he would not have recommended the granting of such authority were it not for the third set of changed conditions.
The third set of changed conditions consists of the tremendous growth, since 1944, in the importance to the public of vastly greater efforts in the area of basic or fundamental research and the education and training of scientists. Universal carries on no basic research and never has. It merely applies the results of such basic research to the industrial problems of the day. The donors of the trust provided (art. *314 second) that all the trust income was to be used by the Society or any successor beneficiary ‘ ‘ exclusively for advanced scientific education and fundamental research in the ‘ petroleum field ’, which may include any field of pure science * * * connected with the petroleum field.” The very same article declared it to be the purpose of the trust “ to advance the public welfare.” It is thus clear that the promotion of basic or pure research, as distinguished from applied research, was expressly declared to be a matter of public welfare which it was the purpose of the trust to promote. Testimony of expert witnesses established that events of the last few years have made it more important than ever that basic research in the petroleum field be expanded, in the interest of our national survival, and that without our share of basic discoveries we will ‘ ‘ lose our leadership in the whole technological area. ’ ’ The Referee aptly points out that the need for basic research is more urgent today than it was during the last war. The evidence indicates that, except for the Society, there are no trust funds or institutions in the United States devoted to fundamental research and advanced scientific education in the petroleum field. An able brief submitted by the Society states that “ almost overnight, the starved condition of fundamental (basic) research and advanced scientific education in the United States has become a subject of national concern. America has suddenly come to realize that no longer can it depend upon others for its basic knowledge for the advancement of its technical arts. * * * The need for expansion of our basic research activities and for greater support for advanced scientific education has acquired added urgency in the last few years' by reason of the specific and significant attention given to them by the Soviet Union. Our failure since the end of World War II to appreciate the value of the quest for new knowledge and better training in the sciences emphasizes the importance of this special proceeding.”
The dependence of the Society, the only organization in this country which is engaged in basic research and advanced scientific education in the petroleum field, upon the trust income derived (except for the interest on an insignificant amount of United States Government bonds), solely from the operations of Universal, appears, however, to be a serious and continuing drawback to its financial ability to promote and advance those purposes properly. No trust income was received by the Society prior to 1946. From 1946 through 1954, the Society received only about $150,000 per year in trust income. This *315 income was grossly insufficient to initiate a program which would effectively carry out the objectives of the trust. One reason the annual income was not greater was the fact that Universal had engaged, with the Society’s approval, in an expensive rehabilitation program, which was necessary to enable it to meet growing competition. Although the trust income has sharply increased since 1954, Universal’s president testified that it plans extensive investment of earnings in future capital improvements. The evidence satisfied the Referee that “a substantial proportion of the future earnings of Universal will continue to be utilized for capital improvements, unless Universal is placed in a position where it is able to obtain equity capital ’ ’ and that “ it is difficult to anticipate the time at which capital outlays will have to be made or the amount of money which will be needed to make the necessary outlays.” The Referee properly finds that ‘ ‘ as long as the securities of Universal constitute the primary asset of the Petroleum Research Fund, the amount of funds available for fundamental research will always be dependent upon two uncertain factors, namely, the earnings of Universal and the extent to which such earnings must be used for necessary capital outlays by Universal,” These factors constitute a great impediment to a successful program in fundamental research, according to the expert testimony adduced before the Referee. This testimony established that such a program required not merely income, but stable income because “ the questions of the properties of nature are not to be answered by any single investigation over any single, short period of time.” There is doubt that the desirable and necessary stability of adequate income can be achieved under present conditions.
On the other hand, if the securities of Universal are sold, as proposed, and the proceeds properly invested in a diversified portfolio, the Society would be reasonably assured of a trust income free from the fluctuations of its present trust income and in an amount adequate to promote a program of basic research and advanced scientific education to an extent not heretofore possible. This conclusion is based, in part, upon the assumption that the price realized from the sale of the Universal securities will be at least $47,250,000, the minimum figure suggested at the hearings. The improvement in Universal’s financial condition during the period of the trust, which is the first change in conditions mentioned by the Referee, has thus brought about the possibility of obtaining a price large enough to produce, when invested in a diversified portfolio, a trust income *316 adequate for the promotion of the fundamental research required of the Society by the trust instrument.
It is thus apparent that a sale under the conditions proposed would, at the same time, promote (1) the cause of basic research in the petroleum field, by freeing the Society from the fluctuations and uncertainties of the trust income derived from Universal’s operations, and (2) Universal’s activities in the field of applied research, by strengthening its financial and competitive position. As the Society’s brief well states, it is unnecessary to decide “ as to the relative values of fundamental research and advanced scientific education on the one hand and of applied research and industrial development on the other.” It is sufficient that both basic and applied research are important to the public welfare. The probability of a marked improvement in Universal’s ability to finance physical expansion and its continuance in its present and future activities, should in all likelihood enhance its usefulness to independent refiners and others even beyond the 10-year period provided for in the supplemental petition. However, if, regrettably, after that period Universal does not fulfill these expectations, the possible resulting detriment to the cause of applied research, must give way to the benefit to the public welfare, if the Society, the only organization in this country devoted to basic research and advanced scientific education in the petroleum field, is enabled to obtain the nonfluctuating income necessary for its proper exploitation of these purposes.
It is important to note that the provision of the trust agreement, which authorized the court to permit a sale, or a discontinuance of Universal’s activities, if changed conditions make that desirable in the public welfare, is not limited to changes of conditions affecting Universal and its operations, but is equally applicable to changes of conditions relating to the Society and the promotion of basic research and advanced scientific education.
For the reasons indicated, this court is of the opinion that a sale of the Universal securities, on the terms proposed in the supplemental petition, is required, in the interest of the public welfare, by changes in conditions since the establishment of the trust. The Referee’s report is accepted to the extent that it recommends granting authority to the trustee to sell the securities of Universal, on the terms and conditions set forth in the supplemental petition and such other terms and conditions as may ultimately be approved by this court.
*317 It does not follow, however, that the trustee should he given carte blanche to consummate a sale of the securities of Universal whenever it should see fit to do so, and for such price and upon such terms and conditions (other than those specified in the supplemental petition) as it may deem desirable. Proper protection by the court of the interests of the indefinite and uncertain beneficiaries of the charitable trust here involved requires that any contract of sale which the trustee may enter into shall be conditioned upon the court’s approval thereof prior to its consummation. This requirement is necessary to insure that the sale price represents the maximum obtainable for the Universal securities upon the terms and conditions specified in the supplemental petition, and that the other terms and conditions are consistent with those set forth in the supplemental petition, as well as proper and desirable in other respects. Giving the trustee free rein to sell at such price and upon such terms as it might determine to be proper, subject only to a future accounting to the court, would not give the beneficiaries of the trust the same protection that they would receive if any sale would require the court’s approval before its consummation.
The requirement that a contract of sale be approved by the court, before its consummation is authorized, is by no means an uncommon one. There is a similar requirement in the case of sales of realty by a trustee (Real Property Law, §§ 107, 107-h, 107-k, 107-1) and sales of real property of an infant or incompetent (Civ. Prac. Act, § 1393). Judicial approval of the contract of sale, before consummation of a sale, is particularly important in the instant case, in view of the fact that the trust agreement prohibits the trustee from selling the securities of Universal without first obtaining the approval of the court. As already pointed out, the propriety of granting such approval is inextricably intertwined with the question of the price to be obtained (which must be large enough to ensure an adequate income to the Society) and the terms and conditions of the sale, including those designed for the benefit of the independent refiners. The power of sale without court order, conferred upon the trustee by article fifth of the trust instrument is preceded by the words “ to such extent as may be consistent with the provisions of Article fourth ”. It is, therefore, applicable only to assets of the trust other than the securities of Universal.
Problems have arisen which require disposition preliminary tp the settlement of a final order authorizing a sale, if one is to be held. Some of these have heretofore been discussed. They relate to terms and conditions of sale of all or part of the secur *318 ities of Universal and methods of sale. Some of them were considered on April 21, 1958, the original return date of this motion and on May 8, 1958, the adjourned day of the motion and during the intervening period. The minutes of hearings of those dates are made part of this proceeding as well as the affidavits and letters of counsel, including the letter of the Attorney-General of May 12, 1958.
The voluminous proof adduced at the hearings before the Referee primarily concerned itself with the changed conditions and the amount of compensation to be received by Guaranty. However, the participants before the Referee did not develop all of the conditions, terms, methods and other phases of a possible sale of any and all of the securities of Universal or the circumstances under which the sale should be had. Divergent views were expressed upon the present motions as to method, procedure and details of sale.
In order to facilitate and expedite the negotiation of a suitable contract of sale, calculated to meet with the court’s approval, it appears to be desirable that this matter be remitted to the Referee. Many problems of policy, as well as of method and details, may arise, during the negotiations and thereafter, which ready access to the Referee for consultation and guidance is likely to resolve without loss of precious time. Among these problems are: (a) the methods, mechanics and procedures to be followed by the trustee; (b) the adequacy of price in the light of all of the circumstances; (c) the question of the fixation of a minimum upset price and the manner of determining same, if fixed; (d) a time limit for the trustee to sell; (e) the position of the Department of Justice; (f) the partial or total sale of the securities; (g) the provision for stock incentives for Universal’s employees; and (h) the contents, type and manner of notice of sale.
The unprecedented character of this trust proceeding, in a setting involving the security of our Nation, demands the utmost of prudence and care in charting the procedural route to be pursued. The matter may require one or more procedural stages for which independent review, scrutiny and intermediate orders may be appropriate.
Remission to the Referee, for the purposes indicated, makes it unnecessary to determine at this time the Attorney-General’s request, upon his motion, that an upset price be fixed. Suggestions have been made that the court appoint a qualified person or persons to evaluate the securities. These suggestions will receive due consideration at the appropriate time. The remis *319 sion to the Referee is not to terminate with the approval by the court of a proposed contract of sale, but is to continue until a sale, if held, has actually been consummated.
The court recognizes that the scope of remission to the Referee is somewhat unusual. The circumstances of the instant proceeding are, however, such as to make imperative, in the public interest, the very broad powers and duties conferred upon the Referee. It should not be overlooked that the Referee’s recommendations all remain subject to the ultimate power of the court to accept or reject them, from time to time, as it may in its judgment determine.
The trustee, within the period suggested by it, is to account to this court upon notice to the Attorney-General after the consummation of a sale, if held. At the time petitioner applies for judicial approval of its accounting, the question of the amount of the compensation to which it is entitled will be determined. In the meantime, determination of that issue will be held in abeyance.
The motion and cross motion are granted only to the extent of remitting the matter to the Referee for the purposes above indicated. Final disposition will be held in abeyance pending the coming in of the ultimate supplemental report which the Referee is to make. This constitutes the order of the court.