Jacob Markowitz, J.
There is now before the court a motion . by the trustee, Morgan Guaranty Trust Co. of New York, for an order (1) disaffirming the further supplemental report of the referee, dated November 16, 1959, and (2) approving the trustee’s application to be allowed as compensation for its services 10% of $72,500,000, that sum representing the proceeds of the sale of the securities of Universal Oil Products Company. There is also before the court a motion by the Attorney-General of the State of New York, “ as attorney for the ultimate charitable beneficiaries ” of the trust here involved, for an order confirming the referee’s recommendation that the compensation of the trustee be based only upon services rendered by it in connection with the sale of the Universal securites and that *84 it be fixed at $750,000 for said services. In addition, the court has before it applications by the referee, the attorneys for the trustee, and others, for the fixation of compensation for the services rendered by them, and an application for judicial settlement of the trustee’s account.
A brief statement of the prior steps in this proceeding (Civ. Prac. Act, art. 79) is appropriate.
The proceeding was instituted in the Spring of 1956, by Morgan Guaranty Trust Co. (then known as Guaranty Trust Co.), as trustee of a charitable, scientific and educational trust, for authority to sell Universal Oil Products Company securities, which constituted substantially the entire corpus of the trust. The trust agreement forbade the disposition of said securities or the discontinuance of Universal’s research and development work in the petroleum field, without a judicial determination that ‘ ‘ conditions shall have changed in such manner and to such extent that the public welfare will be no longer effectively served by such restrictions ”. The court appointed Louis M. Loeb, Esq., as referee to hear and report (1) as to whether changed conditions had made a sale advisable, in the public welfare, (2) as to whether the trustee, in the event a sale was made with the court’s sanction, was entitled to 10% of the proceeds of such sale as compensation for its services (in addition to $50,000 per year which it had retained as compensation) and (3) as to the need for an accounting by the trustee on notice to the Attorney-General. (The court had originally appointed William O’Shea, Esq., as referee, but after he had commenced to act, his unfortunate death necessitated the appointment of a successor referee.) The parties to the proceeding include the American Chemical Society (the beneficiary of the trust income), the Attorney-General (the statutory representative of the indefinite and uncertain beneficiaries), and various independent oil companies, which intervened in the proceeding (3 Misc 2d 790, mod. 3 A D 2d 1). These companies were and are interested in having Universal’s research and development work continue and in keeping control of Universal from falling into the hands of those who might operate the company in a manner detrimental to independent oil companies.
Referee Loeb’s original report recommended that the trustee be authorized to sell the securities of Universal, when it deemed such sale advisable, upon certain terms and conditions intended to insure (1) as widespread dissemination as possible of Universal’s securities (to prevent their acquisition by the major oil companies) and (2) that Universal would continue, for 10 years, its research 'and other activities and its policy of *85 making its technique and know-how available to the petroleum industry on a nondiscriminatory basis. For reasons discussed in its opinion (16 Misc 2d 304) and unnecessary to repeat here, this court found that a sale of Universal’s securities was appropriate, in the interest of the public welfare, by changes of conditions which had occurred after the creation of the trust. The court held, however, that any contract of sale of the securities should be conditioned upon the court’s approval thereof prior to its consummation, in order to insure that the price would represent the maximum obtainable from a sale upon the terms and conditions previously referred to and consistent with the circumstances prevailing. The matter was remitted to the referee for the purpose of determining the conditions, terms, methods and other phases of a proposed sale best calculated to serve the public welfare, including the methods, mechanics and procedure to be followed, the adequacy of the price and the manner in which it was to be arrived at, and the contents, type and manner of notice of sale. An additional matter which the court directed the referee to consider, upon the remission, was the making of suitable provision for stock incentives for Universal’s employees.
Thereafter, in his first supplemental report, the referee recommended the appointment of an individual or firm, of recognized reputation and standing in the field of finance and investment banking, to act as an expert advisor to the referee in connection with the methods and procedure by which a sale, under the conditions of wide dissemination, etc., previously referred to, could be achieved for the maximum price obtainable in said circumstances. The referee also recommended the appointment of an independent appraiser to evaluate Universal’s securities for the purpose of aiding the referee in reaching a conclusion as to whether or not to approve the sales price. The court granted confirmation of the first supplemental report and designated the First Boston Corporation to advise the referee and the court, and the Ebasco Services, Inc., to appraise the value of Universal’s securities (16 Misc 2d 282).
In his second supplemental report, the referee recommended, on the basis of the evidence before him and the advice of the court-appointed financial expert, the First Boston Corporation, (1) that the sale of Universal’s stock be negotiated, subject to the court’s approval, with an investment banking house or syndicate of investment banking houses initially selected by the trustee from among the leading national investment banking houses capable of organizing and managing a group of underwriters to handle the transaction, such selection also to be subject to the court’s approval, (2) that there be no fixation *86 of an upset price, and (3) that no contract of sale be approved by the court unless it incorporate a suitable stock incentive plan for key managerial and technical personnel of Universal. In confirming the second supplemental report, this court found that the purposes to be achieved could best be accomplished by a negotiated sale rather than through competitive bidding (15 Misc 2d 23). In commenting upon the requirement that a stock incentive plan be incorporated in any contract of sale, the court stressed the importance of having the plan’s benefits extend below the top echelons of Universal’s management to the classes of employees whose activities play an important part in the success of Universal’s operations. The court directed the referee to hold a hearing as to (1) whether the selection by the trustee of the investment banks to manage the underwriting group should be approved, or whether the trustee should negotiate with other competent investment bankers who might appear and give evidence at the hearing, (2) whether the terms and conditions of the contract of sale and the underwriting-agreements (draft copies of which were to be made availabe for inspection at the offices of the referee and counsel for the trustee) should be approved, subject to final approval with respect to price and related matters, (3) whether the terms and conditions of the stock incentive plan for employees should be approved, and (4) such other matters related to the sale as might properly come before the referee. The hearing was ordered to be held upon notice to the parties and, in addition, notice through specified advertisements in New York, Chicago, and other newspapers and through a special bulletin or newsletter to be issued by Universal to its employees.
The third supplemental report of the referee recommended approval of the investment bankers selected by the trustee, to wit: “Lehman Brothers; Smith, Barney & Co.; and Merrill Lynch, Pierce, Fenner & Smith”, and of the contracts of sale and underwriting agreements, subject to final approval of the price and related matters. It also recommended approval of the terms and conditions of the stock incentive plan. The report was based upon evidence adduced at a hearing before the referee and upon advice received from the First Boston Corporation, the court-appointed expert advisor. A motion to confirm the report, except for a slight unimportant modification, was granted and a date set for a hearing for the fixation of the price to be paid for the Universal securities (the reasons for this procedure appear in the opinion rendered by the court at the time [15 Misc 2d 23, 27]). After said hearing, the court fixed $72,500,000 as the gross sales price for the capital stock *87 of Universal held by the trustee and authorized the trustee to execute an agreement for a sale at that price and to consummate such sale. In determining what price to fix, the court also received invaluable assistance from Ebasco Services, Inc., the expert appraiser which it had appointed. The trustee was directed to file an account of its proceedings after the sale and to move for judicial settlement thereof. The compensation of the referee, the court-appointed advisors and of counsel was reserved for determination upon the settlement of the account (15 Misc 2d 507).
The sale was thereafter consummated and the trustee subsequently filed an account and applied for settlement thereof as well as for the fixation of the compensation of the referee, the advisors, and. counsel.
The referee’s original report had found that the trustee was not entitled to any compensation, in addition to the $50,000 per year which it had received, except for such services as it might render in connection with a sale of the Universal securities. The trustee had opposed confirmation of this phase of the report. Determination of the issue as to the proper amount of the trustee’s compensation had been held in abeyance pending the consummation of a sale and application for settlement of the trustee’s final account (16 Misc 2d 304, 319). After consummation of the sale, the trustee had renewed a prior motion to disaffirm that part of the referee’s first report which dealt with the trustee’s compensation or, in the alternative, for an opportunity to submit additional evidence on that subject. The court had granted the alternative relief requested and had directed a further hearing by the referee. It fixed the allowances of the two court-appointed advisors (First Boston Corporation at $150,000 and Ebasco Services, Inc. at $60,000) but it held in abeyance the settlement of the account and the fixation of allowances to the referee and counsel, in view of the need for further services on their part (21 Misc 2d 1062).
The referee thereafter filed his fourth supplemental report, dated November 16, 1959, in which he adhered to his prior finding that the trustee was entitled to no compensation (except the $50,000 per year) for its services unconnected with the sale of the Universal securities. The referee found that the phrase “reasonable compensation ”, appearing in article twelfth of the trust agreement, meant $50,000 per annum for ‘ ‘ ordinary services”, including all services except those connected with the sale of Universal’s securities. He based these conclusions upon (1) testimony which, in his opinion, indicated that the trustee had agreed to charge $50,000 per annum for routine *88 services, (2) the fact that the trustee had rendered annual accounts in which it set forth its fee at $50,000, without any mention or reservation of additional compensation, and (3) the lack of evidence that the phrase “ ordinary services ” was not to include all services other than sales services. The referee found that the trustee was entitled to $750,000 for its services in connection with said sale. It is these findings of the referee which are the subject of the pending motions to disaffirm and to confirm.
In support of its motion 'to disaffirm, the attorneys for the trustee have contended that the "referee’s conclusion that the trustee is not entitled to any compensation, over and above the $50,000 per year, for services rendered by it which are not connected with the sale of the Universal securities is contrary to the express language of the trust indenture and to the expressed as well as the actual intention of the parties to the indenture. They also contended that the referee’s recommendation of $750,000 for the trustee’s services in connection with the sale was wholly inadequate. If their position were to be ultimately upheld, as to either or both contentions, by this court or by an appellate court, the trustee would be entitled to a very large amount of compensation for the admittedly excellent and valuable services it rendered in what the referee described as “ its general stewardship of Universal’s revival from potential bankruptcy to a successful contender in the competitive petroleum industry ” (referee’s original report, p. 53), and the sale of Universal’s securities. Recognizing that sharp issues of fact and law exist which render the question of the correctness of the referee’s conclusion a debatable one, the court, in the interest of all concerned, and in order to prevent, if possible, protracted and expensive litigation whose result could not be predicted, actively encouraged the parties to work out a compromise acceptable to all concerned and to the court. Such a compromise was finally agreed upon and meets with the approval of the court. It calls for the fixation of $1,750,000 as the compensation of the trustee as and for its ‘ ‘ additional ’ ’ compensation from the date of the inception of the trust through February 11, 1959, the date on which the trustee disposed of the Universal securities. The ordinary compensation of the trustee is computed at the rate of $50,000 per year from the inception of the trust to February 19, 1959. For all its future services the trustee is to receive 4% of each year’s income, unless this amount is decreased or increased by written agreement between the trustee and the American Chemical Society, approved by the court on notice to the Attorney-G-eneral. This provision of the *89 compromise agreement eliminates, for the future, the uncertainty which exists as to the compensation to which the trustee is entitled under the provisions of the trust agreement and substitutes a clear and definite standard of compensation. The $1,750,000 is less than 25% of the amount of compensation requested by the trustee, while the 4% future rate is 1% less than the 5% rate fixed by statute for trusts of the character here involved (Civ. Prac. Act, § 1548, subd. 5, par. [a]; § 1548-a, subd. 5, par. [a]).
The compromise agreement also provides that the trustee will not designate a successor “qualified recipient ” except with court approval on notice to the Attorney-General, and that the American Chemical Society will not appoint a successor trustee except upon the court’s approval after notice to the Attorney-General.
The fee of Davis Polk War dwell Sunderland & Kiendl, the trustee’s attorneys, is fixed, without objection, at $200,000, in addition to the $185,000 which they have heretofore received. The fees of Brown, Cross & Hamilton and Elisha Hanson, attorneys for the American Chemical Society, are fixed at the amounts they have heretofore received (viz., $19,500 and $160,950, respectively) plus respective disbursements of $203.41 and $1,659.93. Their application for additional fees has been withdrawn. The fee of the referee is fixed, without objection, at $250,000 (inclusive of disbursements). The fee of the deceased referee, William O’Shea, is fixed, without objection, at $25,000. The final account, as brought up to December 31, 1959 in the supplemental account, is judicially settled and allowed as filed, without objection.
It would be inappropriate to terminate this proceeding, which has continued for a period of four years, and which has produced such excellent results for the beneficiaries of the trust, without a few words of commendation for those who have contributed to that result. The trustee, itself, has done an admirable piece of work in rehabilitating Universal from the verge of bankruptcy to its present outstanding position and also in bringing about a.sale of the Universal securities for $72,500,000. Louis Loeb, Esq., the referee, has performed an arduous task with great skill and perseverance. The efforts of the late William O’Shea, Esq., were extremely helpful. The court-appointed advisors have rendered invaluable assistance to the referee and to the court. The Attorney-General has labored valiantly and with great skill in the interest of the charitable beneficiaries and his services have played an important part in the attainment of the final result. The attorneys for the trustee *90 have performed outstanding services in connection with the many difficult and complex problems which arose during the course of the proceeding. The attorneys for the intervening independent oil companies also have played an important part, among other phases, in seeing to it that Universal will continue its research for a long period of years, free from the domination of the larger oil producers. The underwriters and their attorneys, as well as the officers, personnel and attorneys of the American Chemical Society and of Universal, are likewise entitled to great commendation for their co-operation in the attainment of the ultimate result. All who participated are entitled to take deep' gratification in what they succeeded in accomplishing.
The motions are disposed of in accordance with this opinion. Settle order.