[Civ. No. 34255. Second Dist., Div. Five. June 17, 1970.]

In re VETERANS' INDUSTRIES, INC., OF LONG BEACH, CALIFOR-
NIA, in Voluntary Dissolution.
VETERANS' INDUSTRIES, INC., OF LONG BEACH, CALIFORNIA,
Petitioner and Respondent, v. THOMAS C. LYNCH, as Attorney General,
etc., Defendant and Respondent; DISABLED AMERICAN VETERANS,
CALIFORNIA DEPARTMENT, et al., Objectors and Appellants.

COUNSEL

McDaniel & Pinney, Charles A. Pinney, Jr., and Don Edwin Raney for Objectors and Appellants.

No appearance for Petitioner and Respondent.

Thomas C. Lynch, Attorney General, Carl Boronkay and Joanne M. Condas, Deputy Attorneys General, for Defendant and Respondent.

OPINION

AISO, J.—The appellants Disabled American Veterans, California Department, a corporation (hereafter "DAV"), and the Military Order of the Purple Heart of the U.S.A., Inc., Department of California (hereafter "Purple Heart")[1] appeal from an order of the superior court striking on the Attorney General's motion their objections to a proposed disposition of assets under section 9801 of the Corporations Code[2] by the petitioner Veterans' Industries, Inc., of Long Beach, California (hereafter "Veterans' Industries" or "petitioner"), to the Community Rehabilitation Industries, Inc. (hereafter "Community Rehabilitation"), with the Attorney General's consent. The Attorney General based his motion to strike the objections on the ground that the objectors lacked standing to appear or intervene in the proceedings for the purpose of filing objections.

In this court the Attorney General has moved for a dismissal of the objectors' appeals, contending: (1) the objectors lack standing to appeal; and (2) the appeals are now moot, the superior court's judgment (decree) approving the petitioner's proposed disposition having been rendered and entered with neither appellant having appealed therefrom.

Since the objectors' standing to interpose objections was thought to be dispositive of both the appeals and the motion to dismiss the appeals, the Attorney General and the counsel for DAV and Purple Heart have stipulated that both the motion and the appeals may be considered and determined at the same time. ·

The question of standing to intervene, however, represents only the exposed portion of an iceberg. In its total aspect, the problem is: What

[1]The DAV and the Purple Heart will at times be collectively referred to as "the objectors."

[2]Wherever "section 9801" is used, reference to section 9801 of the Corporations Code is intended.

remedy, if any, is available to one who has good cause to believe that a proposed distribution in a section 9801 proceeding will constitute a breach of trust, despite the Attorney General's consent to such distribution, but whose interest in the trust res rises no higher than that of a possible *cy pres* beneficiary? How is the public's paramount interest in the proper discharge of charitable trusts[3] to be protected in such circumstances?

We have concluded that (1) the motion to dismiss the appeals should be denied, (2) the order striking the "objections" filed by DAV and Purple Heart should be affirmed, and (3) mandamus is a proper remedy under the unusual circumstances reflected by the record in this case. We first set forth the factual and procedural background gathered from the record and then consider the following subsidiary issues: (1) Is the order striking the "objections" appealable? (2) Has the subsequent entry of the decree of distribution rendered the appeal moot? (3) Is there good cause to believe a breach of trust imminent? (4) Do the objectors have standing to intervene to object to the proposed distribution? (5) Under the over-all circumstance reflected by the record and our answers to the preceding questions, is there a remedy to invoke the aid of the appellate courts to protect the interests of the public and of the beneficiaries of the charitable trust in question?

### Factual and Procedural Background

Veterans' Industries petitioned the Superior Court of Los Angeles County for a decree approving its dissolution and proposed disposition of assets pursuant to sections 9800 and 9801 of the Corporations Code.[4] Allegations of the petition pertinent to issues before this court were in substance:

---

[3]See, Karst, *The Efficiency of the Charitable Dollar: An Unfulfilled State Responsibility* (1960) 73 Harv.L.Rev. 433, 434.

[4]Corporations Code section 9800: "A nonprofit corporation may dispose of all or substantially all of its assets, or may be wound up or dissolved, or both, in the same manner and with the same effect as a stock corporation, under the General Corporation Law, subject to the provisions of Section 9801."

Corporations Code section 9801: "Upon the dissolution or winding up of a nonprofit corporation, after paying or adequately providing for the debts and obligations of the corporation, the directors or persons in charge of the liquidation shall divide any remaining assets among the members in accordance with their respective rights therein, or dispose of them in such other manner as may be provided in the articles, unless the corporation holds its assets on any trust or is organized for a charitable purpose or purposes.

"If the corporation holds its assets on trust, or is organized for a charitable purpose or purposes, the assets shall be disposed of in such manner as may be directed by decree of the superior court of the county in which the corporation has its principal office, upon petition therefor by the Attorney General or any person concerned in the liquidation, in proceedings to which the Attorney General is a party.

"This section does not apply where the charter of an incorporated subordinate body is surrendered to, taken away, or revoked by the head or national body."

Petitioner is a California nonprofit charitable corporation organized for the purposes set forth in the margin.[5] Its assets consist of $113,885.78 cash deposits. Its members, at a special meeting called by the board of directors, unanimously (6 in favor; 0 against) adopted a resolution "to wind up and dissolve the Corporation, and after paying or providing for all known debts and liabilities, to transfer all remaining assets of the Corporation to Community Rehabilitation Industries of Long Beach . . . or such other Corporation or organizations as may be approved by the Attorney General . . . or by a Decree of the Superior Court . . ., a copy of said Resolution is attached hereto and incorporated herein as Exhibit 'A.' "[6] Its board of directors had also adopted a resolution to wind up and dissolve the corporation.[7] All steps required by the Corporations Code to effect a winding up and a dissolution had been taken except for obtaining a decree "directing the manner of disposing of [its] assets. . ." under section 9801. It prayed, inter alia, that the superior court "enter its

---

[5]"The purposes for which the corporation is formed are charitable, religious and educational; *to provide assistance for needy American veterans of wars in which the United States has been involved, and for their families;* to provide and secure employment, relief, and guidance; to maintain stores, workshops, warehouses and depots for salvaging and reconditioning of items of second-hand personal property, *employing, insofar as possible, veterans and their families* in connection therewith; to work out plans for the *employment of disabled veterans* and to promote and maintain shops and industries which may be adapted for their employment.

"To promote and maintain homes, together with food and clothing for *disabled, indigent, and transient veterans,* and their near relatives, and to *provide for such veterans* and their dependents, hospitalization and sanitarium services.

"*Insofar as possible, preference to be given to disabled veterans and then to indigent veterans and to the families and near relatives and dependents of disabled and indigent veterans.*

"To provide for the education and vocational training of *indigents and disabled veterans* and their dependents and to that end to establish schools and other institutions for education and vocational training and to make donations and give assistance to institutions adapted to these purposes already established.

"To originate and circulate helpful literature of a religious or educational nature, including Bibles and Gospel literature of various descriptions, and to establish, maintain, or give assistance to existing institutions adapted to these purposes.

"While *the primary purposes of the corporation are for the assistance of veterans,* it is permitted to render similar assistance to disabled and indigent non-veterans and to their dependents.

"To accomplish its objectives through individuals, organizations already existing and/or organizations to be formed and maintained for the purpose, by this corporation.

"All net earnings of any of the activities of this corporation shall be reinvested and employed in the furtherance of the objects above enumerated." (Italics added.)

[6]Exhibit "A" does not mention Community Rehabilitation. In the portion entitled "Written Election and Consent of the Members . . . to Voluntarily Dissolution" (*sic*) it contains only a direction to the officers and directors of the corporation "to distribute its assets as directed by decree of the Superior Court. . . ."

[7]As to distribution of assets, it states only "that the distribution of the assets . . . to another charitable trust shall be subject to approval of this Board of Directors and the Attorney General's office, or by order of . . . Superior Court."

decree pursuant to Section 9801 . . . directing that the petitioner's assets be distributed to a suitable successor corporation to be held upon the same trusts as held by petitioner [and] that [the] corporation be dissolved."

The Attorney General filed a written appearance and consent to the winding up and dissolution of Veterans' Industries and the distribution of its assets remaining after dissolution to Community Rehabilitation for the purposes for which it had been formed, to wit:

"(a) To provide a rehabilitation service to all groups of mentally and physically handicapped persons who can or may benefit through the performance of productive and re[mun]erative employment.

"(b) To assist the handicapped person to develop work habits and skills necessary to meet the demands of competitive employment or to achieve such other goals as may be determined possible.

"(c) To provide a work exploration and orientation service for handicapped persons.

"(d) To provide medical supervision, casework service, and such auxiliary services and therapies as may be necessary to assist the handicapped person to achieve his fullest physical, mental, social, vocational, and economic usefulness.

"Such auxiliary services may be provided directly by the organization or through the cooperation of other community agencies.

"(e) To carry on a program of research and evaluation to determine the types of activities that prove most beneficial, the types of handicaps that can be most effectively served, and to evaluate the results achieved by the workshop program.

"(f) To carry on a program of public education concerning the value of employment of handicapped persons and to join with other organizations in working for improved services and opportunities for the handicapped.

"(g) To undertake such other activities as may be determined to be consistent with the principal objectives of the organization."

DAV filed its written appearance and objections to the disposition of assets to Community Rehabilitation contending that such a disposition did not comport with the primary purposes for which the assets are held in trust by Veterans' Industries.

DAV also filed a cross-complaint against the Attorney General and Veterans' Industries praying for declaratory relief and enforcement of a charitable trust. The substance of the cross-complaint may be summarized

as follows: After detailing the corporate purposes for which Veterans' Industries was organized, it averred that all of the funds and assets of Veterans' Industries were derived from salvageable tangible personal property donated by persons in the Long Beach area upon the specific representation to the donors that the property would be used for the benefit of disabled war veterans. The nomination of Community Rehabilitation as the donee was not that of the membership of the dissolving corporation, but that of a named deputy attorney general. Community Rehabilitation's corporate purposes are "substantially different and more extensive in scope" than those of Veterans' Industries and it is not an entity organized for the purpose of holding, administering, or distributing "funds and property for the benefit of disabled war veterans." The proposed distribution "is a calculated disregard" of the trust with which the assets are impressed. The Attorney General's consent is the result of hostility and antagonism against DAV entertained by certain members of the Attorney General's staff in charge of charitable trusts due to certain litigation pending in Orange County. Thus the cross-defendants "have threatened to breach their respective duties with reference to the disposition of the funds and . . . assets" of Veterans' Industries. DAV is a nonprofit California corporation organized at the instance of the Disabled American Veterans, a corporation, and existing by virtue of a Congressional Act,[8] for charitable purposes "for services to and for the benefit of disabled war veterans." It has more than 115 chapters and at least 16,313 members in good standing in California. Its membership is restricted to those wounded, gassed, injured, or disabled in line of duty during service in the United States armed forces and who were thereafter honorably discharged or separated from service or who are still in active service. Since the rights of its more than 16,313 members who are beneficiaries of the trust involved are "in jeopardy of being prejudiced," it is a proper party to assert and advocate the rights of those beneficiaries. It is ready, willing, and able to accept distribution of the assets and administer them in compliance with the terms of the trust with which the assets are impressed; or in the alternative, it can recommend to the court the names of three individuals to serve as trustees of a charitable trust to use the assets "for rehabilitation of, counseling of, and claims assistance to disabled war veterans who are patients in the V.A. Hospital, Long Beach, and who reside in the Long Beach metropolitan area."

By its answer to the cross-complaint served on DAV, Veterans' Industries acknowledged the existence of a controversy with DAV as to the distribution of its assets and funds. It also admitted: that its corporate

[8](36 U.S.C. § 90a; June 17, 1932, ch. 268, § 1, 47 Stat. 320; July 15, 1942, ch. 505, § 1, 56 Stat. 659.)

purposes were as averred by DAV; that Community Rehabilitation's corporate purposes were "substantially different and more extensive in scope than [its] primary purpose"; and that DAV had "a direct and justiciable interest in the disposition of the funds and assets" in question.

It did not directly answer DAV's allegation that Community Rehabilitation's being named as a distributee in Veterans' Industries' petition under section 9801 was not the action of the membership of Veterans' Industries. It admitted that the resolution of the board of directors (not that of the members) did not propose Community Rehabilitation as a proposed distributee, and further alleged that all of the directors[9] had discussed Community Rehabilitation and "had approved it informally as one of several acceptable recipients."

Veterans' Industries denied: that a deputy attorney general had instructed its counsel to name Community Rehabilitation as a possible distributee in its section 9801 petition; that its funds and assets were held *exclusively* for the benefit of disabled war veterans; that it was advocating distribution of its funds and assets to an entity neither formed nor existing to hold, administer, and distribute funds and property for the benefit of war veterans; or that the Attorney General gave his consent to the proposed distribution because of any hostility or antagonism against DAV.

Veterans' Industries also alleged as an affirmative defense that its primary purposes are for veterans, their families, and near relatives, "and insofar as possible to give preference to disabled veterans and to render assistance to disabled and indigent non-veterans," and that by its petition it did not intend to imply any belief or feeling that any veterans' organization should be disqualified from receiving its assets if the organization's aims and objects were consistent with the purposes of Veterans' Industries.

The Attorney General then moved to strike DAV's cross-complaint. By his order filed October 18, 1968, Judge Stratton denied the motion to strike "on condition nevertheless that the office of the cross complaint be hereafter limited and deemed to be only a recitation of additional objections to the petition on file herein."

On December 12, 1968, Purple Heart filed a document entitled, "Protest in re Liquidation," based upon the following grounds: (1) That $100,000 of the funds held by Veterans' Industries was solicited by Purple Heart from the residents of Long Beach "for the benefit of disabled and wounded war veterans and their dependants, [*sic*] which purpose is not within the contemplation of [the] proposed liquidation." (2) The parties

---

[9]It appears, however, from the exhibits attached to the original petition that both the membership and the board of directors were composed of the same six persons: Putnam, Melton, Hill, West, Lucas, and Ellison.

interested in the liquidation intend to distribute the funds to organizations currently being sued by the Attorney General for misappropriation of charitable funds in the Superior Court of Orange County in case No. 156721 entitled Thomas C. Lynch, Attorney General vs. Jack Fisher Chapter 23, Disabled American Veterans, Inc., et al., or to organizations whose record shows little or no charitable work in the Long Beach area, or to organizations so dissimilar in purpose and hence incapable of complying with the purposes of petitioner Veterans' Industries or with the liquidation provisions of the Corporations Code.

Purple Heart further stated that the $100,000 represented the sum which Purple Heart had paid Veterans' Industries for a store lease and fixtures and equipment located at 218 Locust Avenue in Long Beach. The sum was accumulated by Purple Heart from operation of its thrift shops and public subscription "to its work which is assistance to and rehabilitation of wounded, destitute and disabled veterans and their dependents." It alleged that its corporate purposes are identical to the purposes of Veterans' Industries. It set forth a statement of its then current activities in the southern California area, that it was not dependent upon federal or state funds, and that Purple Heart believed that there was "grave danger that the funds will be removed from this area or misapplied in this area for purposes for which they were never intended." It requested the court to impound the funds "until suitable disposition can be arranged or [to turn] over such portion of the funds to [it] as the Court sees fit for application in this City to the purposes for which it was intended."

On January 16, 1969, the Attorney General filed a notice of motion to strike the objections filed by DAV and Purple Heart. Following argument on the motion on January 17, 1969, Judge Wisot by his order dated January 23, 1969, granted the Attorney General's motion to strike and ordered Veterans' Industries' petition to be set for hearing as an uncontested matter. The basis of the foregoing order was that the Attorney General is the proper legal representative of the beneficiaries of charitable trusts, that neither DAV nor Purple Heart has standing "to object or intervene" and neither of them is "a proper party to appear and object to [the] petition or to the disposition proposed." The appeal before us is from this order of January 23, 1969.

The reporter's transcript of the hearing reflects that both the deputy attorney general appearing at the hearing and the superior court misconstrued their respective functions and powers in a section 9801 proceeding. The deputy attorney general represented to the court that if the dissolving corporation nominates "a donee similar in purpose," the Attorney General

is not free to recommend another. The superior court indicated agreement with that point of view and also indicated that the court lacked power to make any substitution.[10]

The Attorney General attached to his brief a copy of the superior court's judgment (decree) entitled, "Order for Disposition of Charitable Assets," dated June 10, 1969, and requested this court to take judicial notice thereof under sections 452 and 459 of the Evidence Code. The objectors have not registered in their closing briefs any objections to our taking judicial notice of the decree as requested, but DAV does contend strenuously that the "order of June 10, 1969, drafted by [the] Deputy Attorney General . . . *does not* reflect the views of Judge Wisot and is *patently* in error as to the statements that appellants DAV and [Purple Heart] 'appeared' in the action." (Italics in original.)

At the oral argument, counsel for the objectors represented that whether their respective clients or either of them receive any of the assets in question

---

[10]"THE COURT: Miss [Deputy Attorney General], in connection with the package that you get when the matter first comes to your attention, has there ever been an occasion for the Attorney General to say, even if the package presents a donee similar in purpose, 'I don't want that donee, but I want another donee.' Does the Attorney General have that authority?

"[DEPUTY ATTORNEY GENERAL]: I never have considered that question. *It does not seem to me that it is the choice of the Attorney General.*

"THE COURT: In other words, dissolution and the proposed donee is a matter that must be presented to them by the dissolving corporation? This is my impression of the law, but I won't admit to having studied it as much as you must have.

"[DEPUTY ATTORNEY GENERAL]: The question has never come up because there never has been a case where a choice was not presented to me, and there never has been a case where the choice was not acceptable, I don't think.

"[ATTORNEY FOR DAV]: You are looking at three people here and I would suggest that Mr. Feldman's client [Community Rehabilitation] was not drawn from the same basket as far as Mr. Witkin is concerned as to the special interest, if you are going to narrow it down to individuals.

"THE COURT: Except that the posture of this case is, as I get it, it was presented to [Attorney General] as a fait accompli. Such being the case, what right do you have to come in and raise an issue? The Attorney General indicates the package is agreeable, and it is consistent. [¶] I would like to see you in the picture and I would like to see Mr. Raney [Purple Heart's attorney] in the picture, but do you have a right to put yourselves in the picture? Are you such a special interest? That is the only problem I have.

"[THE COURT]: I don't see any particular disability of Mr. Feldman's client over the Military Order of the Purple Heart or the organization which you represent, and that is the reason I just asked the last question. *That is the posture in which the Attorney General found himself and he does not have any kind of discretion, at least I don't think so.* It would not be a predicate kind of decision, and *I don't think the Court has the right to say, 'Well, I like the Military Order of the Purple Heart better than [Community Rehabilitation].' Does the Court have that power? I don't think so.*" (Italics added.)

is a secondary matter, and that their primary concern is to prevent what they believe is a breach of a charitable trust.

### Order Striking Objections Appealable

■ We hold the superior court's order striking the so-called objections to the proposed disposition of assets filed by DAV and Purple Heart to be appealable. The filing of these objections, together with DAV's cross-complaint later ruled to be considered as further objections, was in essence an attempt to intervene and to become a party to the proceeding. An order denying leave to intervene is appealable. (*Bowles* v. *Superior Court* (1955) 44 Cal.2d 574, 582 [283 P.2d 704]; *Braun* v. *Brown* (1939) 13 Cal.2d 130, 133 [87 P.2d 1009].) ■ "If leave to intervene is first granted and later set aside or stricken on motion, the intervener may appeal from the order striking the complaint in intervention." (*People* v. *City of Long Beach* (1960) 183 Cal.App.2d 271, 273 [6 Cal.Rptr. 658], and cases there cited.) The order was a final determination of the right of DAV and Purple Heart to join in the proceeding as a party.

■ The fact that the superior court's denial of intervention may be adjudged later to have been proper by the appellate court does not detract from the right to appeal in the first instance. (*Jersey Maid Milk Products Co.* v. *Brock* (1939) 13 Cal.2d 661, 664-665 [91 P.2d 599].)

### Appeal Not Moot

The Attorney General's contention that the appeal has become moot because the proceeding has gone to judgment (decree), from which neither DAV nor Purple Heart has appealed in whole or in part, lacks merit in the context of this case. ■ While it may not be true in all cases, we feel that the following statement of the court in *Linder* v. *Vogue Investments, Inc.* (1966) 239 Cal.App.2d 338, 343 [48 Cal.Rptr. 633], is apposite here: "The simple answer to this contention is that the case proceeded to judgment after the court denied intervention, a denial which was a final judgment . . . and appealable as such . . . . If the court was in error in denying that motion to intervene, the later judgment cannot make that error moot." Furthermore one denied intervention is not entitled to appeal from the judgment. (*Braun* v. *Brown* (1939) *supra,* 13 Cal.2d 130, 133; *Ryan* v. *McKinley* (1932) 124 Cal.App. 765, 766 [13 P.2d 522].) Even participation as an amicus curiae in the proceedings leading to judgment adds nothing to the right to appeal from the judgment in the situation presented here. ■ "Not being a party to the action, the amicus curiae has limited powers . . . . If his motions are denied or his views ignored, he has no right to take exception or to appeal." (3 Cal.Jur.2d, Amicus

Curiae, § 7, p. 240.) The failure of the objectors to appeal from the judgment[11] under these circumstances is not cognizable as a factor on the issue of mootness. "The law never requires impossibilities." (Civ. Code, § 3531.) "No man is responsible for that which no man can control." (Civ. Code, § 3526.)

Moreover, the judgment itself orders that pending determination of the appeal now before us, the assets of Veterans' Industries are to be placed in the name of Community Rehabilitation in blocked accounts in certain enumerated savings and loan associations and subject to withdrawal upon further order of court. Jurisdiction to make any further orders to implement and supplement the judgment was expressly reserved in the judgment. Consequently, there has been no final disposition of assets which would render this appeal moot.

### Impending Breach of Trust Shown

The record reflects more than just a plausible cause to believe that a breach of trust was imminent. Purple Heart alleged that its purposes were identical to those of Veterans' Industries, whose primary purposes are to extend aid to disabled and indigent war veterans and their families, whereas the purpose clauses of Community Rehabilitation make no mention of war veterans as a specifically designated class of beneficiaries. Yet, the Attorney General appeared and filed his written consent to the disposition of Veterans' Industries' residual assets, exceeding $100,000, to Community Rehabilitation. It also appears, as previously noted, that both the Attorney General and the superior court misconstrued their respective functions and powers in a section 9801 proceeding.

A proceeding under section 9801 like the one presented here calls for an application of the equitable doctrine of *cy pres*.[12] A charitable

---

[11]It is not clear whether "the Motion for Order Granting Leave to Intervene in Pending Action and for Stay of Military Order of the Purple Heart, Department of California" mentioned in the judgment was made as an amicus curiae or as a formal motion for leave to intervene in the proceedings. If it was no more than a suggestion of an amicus curiae, there was no right to appeal. If it was an independent motion for permission to intervene, an appeal from the portion of the decree denying the motion would have been but a duplication of the issue raised in this appeal. Idle acts are unnecessary. (Civ. Code, § 3532.)

[12]"The words '*cy pres*' are Norman French for 'as near.' The phrase when expanded to its full implication was '*cy pres comme possible*,' and meant 'as near as possible.' . . . Roughly speaking it is the doctrine that equity will, when a charity is originally or later becomes impossible, inexpedient, or impracticable of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible." (Bogert, Trusts and Trustees (2d ed. 1964) § 431, p. 390; see also: 14 C.J.S., Charities, § 52, p. 512; 15 Am.Jur.2d, Charities, § 131, p. 138; Black's Legal Dictionary (rev. 4th ed. 1968) p. 464.)

corporation is being wound up and dissolved and its assets held upon a charitable trust are to be transferred to another corporation, organization, society, or trust so that the original trust purposes can be carried out if that is possible.

■ A charitable corporation organized exclusively for charitable purposes, as Veterans' Industries was, holds its assets in trust for the purposes enumerated in its articles of incorporation even though they were not otherwise expressly ear-marked for charitable trust purposes when acquired by the corporation. (*Lynch* v. *Spilman* (1967) 67 Cal.2d 251, 263 [62 Cal.Rptr. 12, 431 P.2d 636]; *Pacific Home* v. *County of Los Angeles* (1953) 41 Cal.2d 844, 852 [264 P.2d 539]; *In re Los Angeles County Pioneer Soc.* (1953) 40 Cal.2d 852, 860 [257 P.2d 1], cert. denied 346 U.S. 888 [98 L.Ed. 392, 74 S.Ct. 139].)

The New York and Illinois statutes governing the dissolution of charitable corporations expressly provide that the distributee be "engaged in activities substantially similar to those of the dissolving" corporation.[13] Under such a statute the dissolution and distribution have been held to be subject to *cy pres*. (*Application of Richmond County S.P.C.C.* (1960) 11 App.Div. 2d 236, 239 [204 N.Y.S.2d 707, 710]; cf. *Application of Italian Benevolent Institute* (Sup. 1956) 157 N.Y.S.2d 485, 491, modified on another point in 5 App.Div.2d 816 [170 N.Y.S.2d 992].) We are not informed whether the words "substantially similar" were used for the purpose of a legislative broadening of the judicially formulated *cy pres* criteria.

■ Our section 9801 directs only that the assets of the dissolving charitable corporation "shall be disposed of in such manner as may be directed by *decree* of the superior court." (Italics added.) The use of the word "decree" appropriate to equitable proceedings instead of "judgment" or "order" is not without significance. The section, read in the light of relevant non-statutory authorities, indicates that there was an implied postulate that the superior court would apply *cy pres* in rendering its decree. (*In re Los Angeles County Pioneer Soc.* (1953) *supra*, 40 Cal.2d 852, 863, 866; *First Christian Church* v. *Brownell* (1955) 332 Mass. 143, 147 [123 N.E.2d 603, 607]; see: Rest.2d Trusts, § 399, com. o, p. 306, and Note, *The Charitable Corporation* (1951) 64 Harv. L.Rev. 1168, 1180-1181.)

■ By definition, in applying *cy pres* the court should order a distribution which will carry out the original trust purposes as nearly as possible. (See fn. 12, *supra*.) It will not do to make a distribution to a

---

[13]New York: Not-for-Profit Corp. Law, sections 1005 (a) (3) (A) and 1008 (a) (15). Illinois: Smith-Hurd Ill. Ann. Statutes, sections 163a44 (c) and 163a54 (c).

charity whose purposes are generally similar if there is another charity whose purposes are identical, absent other factors which would frustrate the original charitable purpose. Basically, "charitable contributions must be used only for the purposes for which they were received in trust" (*Holt* v. *College of Osteopathic Physicians & Surgeons* (1964) 61 Cal.2d 750, 754 [40 Cal.Rptr. 244, 394 P.2d 932]). ▆ "The policy of the law in favor of charitable gifts requires a court to carry out the dominant purpose of the donor to make a charitable gift for the purposes expressed in the articles of the original corporate donee." (*In re Los Angeles County Pioneer Soc.* (1953) *supra,* 40 Cal.2d 852, 865-866.) Only when compliance with these foregoing rules becomes impossible does the application of *cy pres* come into play. [14]

▆ It is the Attorney General's duty to protect interests of the beneficiaries of a charitable trust. (Corp. Code, §§ 9505, 10207; Gov. Code, §§ 12584, 12591; *Estate of Schloss* (1961) 56 Cal.2d 248 [14 Cal.Rptr. 643, 363 P.2d 875]; *Estate of Ventura* (1963) 217 Cal.App.2d 50, 57 [31 Cal.Rptr. 490].) Under section 9505 of the Corporations Code, there is imposed "upon the attorney general . . . an additional obligation (rather than a mere discretion) to institute suit when he has concluded after investigation that there has been a breach of a charitable trust or a departure from the general purposes for which the corporation was formed." (*Brown* v. *Memorial Nat. Home Foundation* (1958) 162 Cal.App.2d 513, 537 [329 P.2d 118], cert. denied 358 U.S. 943 [3 L.Ed.2d 352, 79 S.Ct. 353].) ▆ Section 9801 authorizes him to initiate the proceeding by petition. Should any other "person concerned in the liquidation" institute the proceedings, the Attorney General must be made a party. No doubt this latter requirement is to permit him to exercise his duty as the primary guardian of the general public's interest in charitable trusts. ▆ Any nomination of a distributee by the dissolving corporation is not binding upon the court. (*First Christian Church* v. *Brownell* (1955) *supra,* 332 Mass. 143, 148 [123 N.E.2d 603, 607]; *Application of Richmond County S.P.C.C.* (1960) *supra,* 11 App.Div.2d 236, 239 [204 N.Y.S.2d 707, 710].) Such a nomination should not prevent the Attorney General from exercising his discretion in preliminarily determining whether there are other charitable corporations or organizations that would qualify as a potential *cy pres* beneficiary and, if there are any, to bring those to the attention of the court. Under the Uniform Supervision of Trustees for Charitable Purposes Act (Gov. Code, §§ 12580-12597), he is the one who is most likely to have this information. In fact, it would appear that in the usual case, the Attorney General does actively participate in developing plans to carry

---

[14]See Karst, *op. cit. supra,* for discussion concerning possibility of applying *cy pres* where execution of the original trust becomes inexpedient through factors, such as obsolescence, etc.

out *cy pres* requirements in connection with reorganizations of charities. "The legal staff of the Attorney General renders comparable assistance in developing suitable reorganization plans and in invoking the doctrine of cy pres so that the charitable intent of donors may be most efficiently served in the light of changing conditions." (Howland, *The History of the Supervision of Charitable Trusts and Corporations in California* (1966) 13 U.C.L.A. L.Rev. 1029, 1032.)

 While the Attorney General may consent to the distribution to the nominee suggested by a petitioner or recommend others for the consideration of the court, neither such consents nor recommendations by the Attorney General are binding upon the court upon whom the ultimate responsibility for the proper application of *cy pres* rests. (*Town of Brookline* v. *Barnes* (1951) 327 Mass. 201, 207-208 [97 N.E.2d 651, 655]; *In re Petroleum Research Fund* (1959) 16 Misc.2d 304, 309-310 [184 N.Y.S.2d 413, 420-421]; *Peter E. Leddy Post No. 19 of American Legion* v. *Roberts* (1925) 99 N.J.Eq. 217, 222 [129 A. 148, 150-151]; see 4 Scott on Trusts (3d ed. 1967) § 399, pp. 3087-3088.)

In the case before us, the petitioner did not specifically pray that the court approve a disposition of its residual assets to Community Rehabilitation. It prayed only that the "Court enter its decree pursuant to Section 9801 of the Corporations Code directing that the petitioner's assets be distributed to a suitable successor organization to be held upon the same trusts as held by petitioner."

Thus up to the point where the objectors' objections were ordered stricken from the file, one cannot categorically deny that there was an imminent breach of trust due to erroneous conceptions entertained by the Attorney General and the superior court as to their respective functions and powers in the pending 9801 proceeding.

### No Standing to Intervene

We judicially notice that DAV and Purple Heart are California subsidiaries of national organizations whose membership consists of thousands of disabled and wounded war veterans. We also judicially note that other veterans' organizations (e.g., American Legion, Veterans of Foreign Wars, Jewish War Veterans, etc.),[15] which are not less interested in the welfare of war veterans, are not before the court in these proceedings. The record also shows that the primary purposes of Veteran's Industries include welfare activities for the benefit of veterans, who may not have suffered any wounds or disabling service-connected injuries, but who are indigent. DAV

---

[15]Evidence Code section 452, subdivision (g); section 459.

and Purple Heart, therefore, do not claim, nor can they claim, that they represent all the beneficiaries of the Veterans' Industries trust either in the Long Beach area or elsewhere.

 On the other hand, we recognize that "[b]eneficiaries of a charitable trust, unlike beneficiaries of a private trust, are ordinarily indefinite and therefore unable to enforce the trust in their own behalf." (*Holt* v. *College of Osteopathic Physicians & Surgeons* (1964) *supra*, 61 Cal.2d 750, 754.) In *Holt*, the court also observed: "Although the Attorney General has primary responsibility for the enforcement of charitable trusts, the need for adequate enforcement is not wholly fulfilled by the authority given him. The protection of charities from harassing litigation does not require that only the Attorney General be permitted to bring legal actions in their behalf. . . . There is no rule or policy against supplementing the Attorney General's power of enforcement by allowing other responsible individuals to sue in behalf of the charity." (61 Cal.2d at p. 755.) It approved "[t]he prevailing view of other jurisdictions . . . that the Attorney General does not have exclusive power to enforce a charitable trust and that a trustee or other person having a sufficient special interest may also bring an action for this purpose." (61 Cal.2d at p. 753.) It did uphold nevertheless the line of California cases stating that " '. . . the only person who can object to the disposition of the trust property is one having some definite interest in the property—he must be a trustee, or a *cestui,* or have some reversionary interest in the trust property.' " (61 Cal.2d at p. 753.)

 These holdings and observations must be interpreted in the light of the California statute (Code Civ. Proc., § 387) which requires that a person seeking intervention must have "an interest in the matter in litigation, or in the success of either of the parties, or an interest against both." [16] The claimed interest must be direct or immediate in character to the extent that the intervener will either gain or lose by the direct effect of the judgment. (*Jersey Maid Milk Products Co.* v. *Brock* (1939) *supra*, 13 Cal.2d 661, 663; *La Mesa etc. Irr. Dist.* v. *Halley* (1925) 195 Cal. 739, 741 [235 P. 999]; *Faus* v. *Pacific Elec. Ry. Co.* (1955) 134 Cal.App.2d 352, 356 [285 P.2d 1017]; *People* v. *Brophy* (1942) 49 Cal.App.2d 15, 34 [120 P.2d 946].)

The only California cases within the zone of approximate relevancy appear to be *Bernheimer* v. *Bernheimer* (1948) 87 Cal.App.2d 242 [196 P.2d 813], and *Pratt* v. *Security Trust & Sav. Bank* (1936) 15 Cal.App.2d

---

[16] The pertinent portion of Code of Civil Procedure section 387 provides: "At any time before trial, any person, who has an interest in the matter in litigation, or in the success of either of the parties, or an interest against both, may intervene in the action or proceeding."

630 [59 P.2d 862]. *Bernheimer* deals only with a contingent remainder interest of a charitable hospital. The testator set up a trust in Missouri making his son the life beneficiary with the remainder over to a Missouri charitable hospital in the event the life beneficiary should die without leaving lawful issue. While the son and his wife were domiciled in California, the son obtained a Mexican divorce, remarried, and had an offspring of the second marriage. Later, the wife obtained a divorce in Missouri. The son later brought a third divorce proceeding in California. The Missouri hospital sought to intervene in the California divorce action alleging that the previous Mexican and Missouri divorces were valid, that under Missouri law the offspring of the second marriage would not be a lawful issue of the life beneficiary, and that the sole purpose of the California divorce proceeding was to make the offspring of the second marriage a lawful issue in order to deprive the hospital of its contingent remainder interest. The court held that the hospital's interest was not sufficiently direct to permit an intervention.

In *Pratt* v. *Security Trust & Sav. Bank* (1936) *supra,* 15 Cal.App.2d 630, 640, the court held that although a member of the public or a potential beneficiary of a charitable trust has an interest in the charitable use, it is not such a vested interest as would permit his bringing an action for a misuse of the trust fund, because the primary right to enforce a charitable trust resides in the Attorney General.

Perhaps the case presenting the closest factual parallel to the instant case is *Sister Elizabeth Kenny Foundation, Inc.* v. *National Foundation* (1964) 267 Minn. 352 [126 N.W.2d 640] (hereafter *"Kenny Foundation* case"). Here the testamentary donor left a sum to the Kenny Foundation "to be used for the free treatment of needy victims of poliomyelitis who reside in the State of New York." Prior to the donor's death, the foundation operated a polio clinic in New York, but later closed it down maintaining a treatment center across the river in Jersey City, New Jersey, to which victims of polio in New York could go for treatment. In view of the foregoing situation, together with a diminution of poliomyelitis cases following the development of the Salk vaccine, Kenny Foundation petitioned the court to permit amendment to the charitable trust purposes to include the rehabilitation "of persons crippled by all sorts of muscular and skeletal diseases or injuries" aside from that caused by poliomyelitis. The National Foundation, more commonly known as "The March of Dimes" sought to intervene to assert certain claims to the trust funds involved.

The Minnesota Supreme Court held that under *the portion* of its rule governing interventions reading, "[W]hen the applicant has such an inter-

est in the matter in litigation that he may either gain or lose by the direct legal effect of the judgment therein whether or not he were a party to the action," National Foundation's interest did not entitle it to intervene as a matter of right. The court stated: "It is no doubt true that National's chances of being named beneficiary may be greater than those of an ordinary member of the general public since it has been engaged in the treatment of polio victims and would be better equipped to carry out the terms of the trust, *but it still has no greater 'interest' in, or claim to, the trust proceeds than other members of the public.*" (267 Minn. 352, 357-358 [126 N.W.2d 640, 643-644].) (Italics added.)

The fact that a substantial segment of the potential beneficiaries of the charitable trust in question are members of DAV and Purple Heart does not give them any greater standing in the instant case than National Foundation had in the *Kenny Foundation* case. It might well be that DAV and Purple Heart could represent its members (*Santa Clara County Contractors & Home-Builders Assn. v. City of Santa Clara* (1965) 232 Cal.App.2d 564, 569-570 [43 Cal.Rptr. 86]), but this is not to say that either of them can represent all of the unknown numberless potential beneficiaries.

It has been held that a charitable corporation even if named as a possible successor trustee by the dissolving corporation does not have, as a possible beneficiary under application of *cy pres,* an "interest different in kind from that of the public generally, which is represented exclusively by the Attorney General." (*First Christian Church v. Brownell* (1955) *supra,* 332 Mass. 143, 147 [123 N.E.2d 603, 607]; cf. *Application of Richmond County S.P.C.C.* (1960) *supra,* 11 App.Div.2d 236, 239-240 [204 N.Y.S.2d 707, 710-711].)[17]

█ The interest of a possible *cy pres* beneficiary not named or nominated by the dissolving corporation is of course no greater than that of one which is named or nominated. (*Bolster v. Attorney General* (1940) 306 Mass. 387, 389 [28 N.E.2d 475, 476]; *In re Nevil's Estate* (1964) 414 Pa. 122, 128-129 [199 A.2d 419, 422-423].)

There are authorities in other jurisdictions which hold that an organization like the DAV and Purple Heart should be permitted to intervene in the discretion of the trial court, but without the right to appeal from any adverse ruling of the trial court.[18] (E.g., *Kenny Foundation* case (1964) *supra,* 267 Minn. 352, 361 [126 N.W.2d 640, 646]; *Application of Rich-*

---

[17] Affirmed per curiam 9 N.Y.2d 913 [217 N.Y.S.2d 86, 176 N.E.2d 97]; appeal dismissed and cert. denied, 368 U.S. 290 [7 L.Ed.2d 336, 82 S.Ct. 375].

[18] Such a right or privilege amounts to no more than that granted an amicus curiae in California.

*mond County S.P.C.C.* (1960) *supra,* 11 App.Div.2d 236 [204 N.Y.S.2d 707]; 4 Scott on Trusts (3d ed. 1967) § 399, p. 3088.) However, such discretionary intervention has been granted only where a statute or rule authorizes such discretionary action by the court (*Kenny Foundation* case (1964), *supra.*) In that respect those statutes or rules differ from our California statute governing the right to intervene. (*In re Petroleum Research Fund* (1956) 3 Misc.2d 790, 792 [155 N.Y.S.2d 911, 913-914], modified on a different point 3 App.Div.2d 1 [157 N.Y.S.2d 693].)

The claim that the $100,000 of the amount which Veterans' Industries proposes to dispose represents the fruit of Purple Heart's solicitation from residents of Long Bench "for the benefit of disabled and wounded war veterans and their dependents," adds nothing to Purple Heart's claim that it has standing to intervene. That sum was paid in payment for assets, tangible and intangible (Veterans' Industries' store lease and fixtures and equipment located at 218 Locust Avenue in Long Beach), received as a *quid pro quo.* Having parted with the $100,000 which it held in trust for a valuable consideration, Purple Heart can no longer object to its disposition other than as a relator.[19] (*O'Hara* v. *Grand Lodge I.O.G.T.* (1931) 213 Cal. 131, 140 [2 P.2d 21].)

We, therefore, hold that the superior court did not err in striking the "objections" of DAV and Purple Heart upon the ground that neither had standing to intervene in the section 9801 proceedings before the court.

### Availability of Mandamus

It is sometimes observed that even though one's interest in the subject matter or the outcome of an action is insufficient to permit an intervention, such a person's rights had been adequately protected by his having been permitted to appear as an amicus curiae setting forth his contentions in an amicus curiae brief or points and authorities. (*Jersey Maid Milk Products Co.* v. *Brock* (1939) *supra,* 13 Cal.2d 661, 665; see 2 Witkin, Cal. Procedure (1954) Pleading, pp. 1089, 1104-1105.) By that means, illegality of a transaction may be brought to the attention of the court. (*McAllister* v. *Drapeau* (1939) 14 Cal.2d 102, 113 [92 P.2d 911]; *In re Frowenfeld* (1935) 3 Cal.App.2d 576, 579 [40 P.2d 552].) ▇ But there is no right to compel the court to permit one to appear as an amicus curiae (3 Cal.Jur.2d, Amicus Curiae, § 3, p. 238) and a denial of permission to appear as an amicus curiae is not appealable (*People* v. *City of Long Beach* (1960) *supra,* 183 Cal.App.2d 271, 276). As we have earlier pointed out an amicus curiae has no standing to appeal from a decree or judgment

[19]The right of a relator will be explained more fully later.

in the event the superior court rules against the position advocated by him, as apparently happened in the instant case. With no appeal by a party having standing to appeal, the propriety of the decree cannot be reviewed by an appellate court via the appeal route.

 One lacking a direct interest sufficient to permit an intervention also may be permitted to sue as a relator to enforce compliance with a charitable trust. (*O'Hara* v. *Grand Lodge I.O.G.T.* (1931) *supra,* 213 Cal. 131, 140.) "A relator is a party in interest who is permitted to institute a proceeding in the name of the People or the attorney general when the right to sue resides solely in that official. . . . The attorney general prescribes his own rules for granting such consent and they may be entirely informal." (*Brown* v. *Memorial Nat. Home Foundation* (1958) *supra,* 162 Cal.App.2d 513, 538-539.) The right of a relator is inadequate, however, where the Attorney General refuses to act or takes a position contrary to that espoused by the relator. (See, Comment (1966) 13 U.C.L.A. L.Rev. 1123, 1126.)

On the other hand, a writ of mandamus may be issued "to any inferior tribunal, corporation, board, or person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station. . . ." (Code Civ. Proc., § 1085.) Here the petitioner for the writ need not show any legal or special interest other than that of a citizen to have the laws of the state executed and the duty in question enforced. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 829 [27 Cal.Rptr. 19, 377 P.2d 83]; *Hollman* v. *Warren* (1948) 32 Cal.2d 351, 356-357 [196 P.2d 562].) This is especially true where the Attorney General appears in unmeritorious opposition. (*Vinton* v. *Hoskins* (1944) 174 Ore. 106, 109 [147 P.2d 892, 893].) In *Trickey* v. *City of Long Beach* (1951) 101 Cal.App.2d 871, 873 [226 P.2d 694], a taxpayer was permitted to bring a mandamus proceeding against a municipality and its officers "to compel them to 'cease' transferring funds from the city's 'Gas Revenue Fund' to its 'General Purpose Fund' " "on the ground that they were trust funds which could be used only for harbor purposes and not for general municipal purposes." To the objection that he did not have capacity to sue since the funds were not raised by direct taxation, the court replied rhetorically: "Must a taxpayer, when he sees the money of the city being unlawfully applied and paid out for unlawful purposes, sit idly by, and is he without right either to stay the illegal expenditures or recover the same on behalf of the city after they are made, simply because he cannot show that he thereby sustained some special damage? This court has repeatedly held that he is not so helpless. . . ." (101 Cal.App.2d at p. 881.)

The fact that the legal duty imposed upon the Attorney General and the

superior court in a section 9801 proceeding is one which calls for an exercise of discretion does not constitute an insurmountable obstacle under all situations. (See, Jaffe, Cases and Materials on Administrative Law (1953), pp. 499-503.) ▊ "While ordinarily, mandamus may not be available to compel the exercise by a court or officer of the discretion possessed by them in a particular manner, or to reach a particular result, it does lie to command the exercise of discretion. . . ." (*Hollman* v. *Warren* (1948) 32 Cal.2d 351, 355 [196 P.2d 562]; see also, Karst, *op.cit. supra*, p. 451, fn. 68.)

The objectors have presented us with a record which does reflect a potential, if not an imminent, breach of a charitable trust with both the Attorney General and the superior court denying the power to exercise a *cy pres* discretion under circumstances in which the law imposes both a duty and a power to exercise their respective discretions. Although the Attorney General has furnished us with a copy of the decree (Order for Disposition of Charitable Assets) dated June 10, 1969, by attaching it as an exhibit to his brief, the decree itself without a full record (including a reporter's transcript) of the uncontested hearing on the section 9801 petition is not adequate to dispel the showing made by the objectors on the record before us. DAV contends in its closing brief that the June 10, 1969, order (decree) "*does not* reflect the views of Judge Wisot and is *patently* in error as to the statements that appellants DAV and [Purple Heart] 'appeared' in the action." If the full record of the hearing on the merits of the petition will establish that Judge Wisot did not change his views as to the functions and powers of the Attorney General and of the superior court from that indicated by him on the hearing on the motion to strike the objections filed by DAV and Purple Heart, then remedy by way of writ of mandamus should be made available, for there is then no other adequate remedy.

We have previously held that the objectors have no standing to intervene for the purpose of interposing objections to the proposed distribution. We have pointed out why remedy by way of participation as either a relator or an amicus curiae is inadequate in the situation presented by this case. The jurisdiction of the appellate courts cannot be invoked by appeal where no party having standing to appeal seeks an appeal. In the meantime, the interests of beneficiaries and of the public in seeing that the charitable trust in question be properly enforced may stand unprotected and jeopardized.[20]

[20]In New York where a discretionary right of intervention is recognized, it has been pointed out that such an intervention is especially desirable where no one having a direct interest in the trust res and the Attorney General do not oppose the application or petition before the court. "[I]n the absence of the intervenors, there is, as a practical matter, no real adversary proceeding before the court. . . . Responsibility for ultimate decision rests with the court. Obviously, the court will be assisted materially by

"[M]andamus has been employed to correct the errors of inferior tribunals and to prevent a failure of justice or irreparable injury where there is a clear right, and there is an absence of any other adequate remedy, as for instance where no appeal lies. . . . It may also be employed to prevent an abuse of discretion, or to correct an arbitrary action which does not amount to the exercise of discretion." (*Bales* v. *Superior Court* (1942) 21 Cal.2d 17, 25 [129 P.2d 685].)

The court considering the petition for a writ of mandamus can protect the charities involved from harassing litigation by the exercise of its discretion to deny the writ where the objections to the distribution decreed by the superior court under section 9801 are frivolous, vexatious, or otherwise lacking in merit. On the other hand, "for every wrong there is a remedy." (Civ. Code, § 3523.)

If the objectors can make a showing bringing themselves within requirements delineated by the views which we have set forth above, then they should not be barred from seeking a writ of mandamus by the disposition we make of this appeal and motion to dismiss appeal.

### Disposition

Motion to dismiss appeals is denied; order striking the objections of DAV and Purple Heart is affirmed; each party to bear its own respective costs on appeal.

Kaus, P. J., and Reppy, J., concurred.

A petition for a rehearing was denied July 2, 1970, and the petition of the defendant and respondent for a hearing by the Supreme Court was denied August 12, 1970.

---

a presentation of relevant facts by the intervenors who propose to contest the petitioner's application." (*In re Petroleum Research Fund* (1956) 3 App.Div.2d 1, 4 [157 N.Y.S.2d 693, 696].)