[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 488 
OPINION
Wilma Lempie Jackson, decedent, left a holographic will which was admitted to probate on May 5, 1977. Bruce A. Altman, public administrator, was appointed administrator with-will-annexed. On November 2, 1977, the public administrator filed a petition to determine entitlement to distribution. The last portion of decedent's holographic will (exhibit 1 attached to this opinion) reads as follows: ". . . and the rest to the heart fund after my bills are paid up." The petition alleges that two associations, namely the American Heart Association, Greater Los Angeles Affiliate (American Heart Association), and Memorial Heart Research Foundation (Memorial) had made claim to the residue. The public administrator sought direction from the court on which organization was entitled to the residue of the estate.
The court's pertinent findings of fact are as follows:
"3. There is no clear indication as to who Decedent was referring to when she directed in her holographic Will dated September 1, 1974, that the residue of her Estate be distributed `to the heart fund.'
"4. By directing in her holographic Will dated September 1, 1974, that the residue of her Estate be distributed `to the heart fund,' Decedent *Page 489 
intended to bequeath the residue of her Estate to charitable organizations actively soliciting funds for or carrying on heart research[1]
"5. Memorial Heart Research Foundation and American Heart Association, Greater Los Angeles Affiliate, are charitable organizations actively soliciting funds for or carrying on heart research.
"6. Neither American Heart Association, Greater Los Angeles Affiliate nor Memorial Heart Research Foundation have been able to establish any connection or relationship to the Decedent."
The findings of the trial court end with a determination that the two associations are each entitled to one-half of the residue.
Although there is no specific finding that the court applied the cy pres doctrine, it is clear that the court did so in making its final determination. During the hearing, the court noted that neither party had been able to establish any relationship with the decedent, and then proceeded to say: "So I suppose the best way to do it is to play Solomon and give half of it to each of you. [¶] I can't do much more than that. My personal belief is that the Heart Fund, or the American Heart Association, is the one that does the most advertising and is probably the most widely known. I frankly don't know too much about the Memorial Heart Research Foundation, myself. And if I were going to give a gift to the Heart Fund, I suppose it would go to the American Heart Association. [¶] But without any intent being shown, I think the fairest thing to do is to divide it between the two of you."
After further colloquy between court and counsel, the court concluded by saying: "I think the doctrine of cy pres applies."
 DISCUSSION (1) The words "cy pres" are Norman French for "as near." When expanded to its full implication the phrase was "cy prescomme possible" and meant "as near as possible." (See Bogert, Trusts and Trustees (rev. 2d ed. 1977) § 431, p. 490; and In reVeterans' Industries, Inc., 8 Cal.App.3d 902, 917, fn. 12 [88 Cal.Rptr. 303].) Roughly speaking it is the doctrine that equity will, when a charity is originally or later becomes impossible, inexpedient, or impracticable of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible. (Bogert, supra, at p. 490.) *Page 490 
(2) Further illumination of the doctrine is found in Restatement Second of Trusts (§ 399, com. o, p. 305) where, in a discussion of the cy pres doctrine, it states: "If a testator devises or bequeaths property to a charitable corporation or association which refuses to accept the devise or legacy, or which is incapable of taking or holding it, or which is not in existence, the disposition will not fail if the testator manifested an intention to devote the property to charitable purposes and not merely to make a gift to the particular corporation or association." In Estate of Lamb, 19 Cal.App.3d 859, 866 [97 Cal.Rptr. 46], reference is made to the above restatement comment where the court states: "It will be seen from the above that there are two essentials of application of cypres where the donee of a charitable gift ceased to exist (the more frequent occurrence) or did not yet exist at the date of the death of the decedent. The first is that the gift must be truly a charitable one, that is, it must be intended to benefit either the whole community or a class indefinite as to members and individuals [citation]; and the second, that the dominant intent of the donor must be that of carrying out a charitable purpose, the particular instrument for doing this being secondary."
(3a) In our present case, the reasons for applying the cypres doctrine do not exist because, from the evidence before the court, it was possible to distribute the residue to "the heart fund" as the decedent requested. The American Heart Association clearly fit this description, while Memorial did not.
(4) Where there is an ambiguity in a will, the testator's intent may be derived from extrinsic evidence as well as from the will itself. (53 Cal.Jur.2d, Wills, § 427, p. 706.) And where the ambiguity is in the will's designation of a beneficiary, namely, there are two or more persons or organizations who measure up to the designation or description mentioned in the will, extrinsic evidence is admissible for the purpose of identifying the intended beneficiary. (Id., § 429, pp. 708-709.) It would seem, at first glance, that we had such an ambiguity here.
(3b) Although the court was presented with no evidence that decedent had dealt with either claimant, there was extrinsic evidence to establish that American Heart Association was known and recognized as the "Heart Fund," while no such evidence was presented by Memorial. The only evidence before the court from Memorial was a letter by its counsel, Milton J. Nenney, to the public administrator that stated: "Heart Research Foundation was incorporated in Los Angeles County on September 24, 1953, and actively carried on its charitable activities in the field of cardiovascular research with the support of public charitable contribution from that date until October 10, 1962 when its corporate name was changed to Wiley Winsor Memorial Heart Research Foundation. *Page 491 
On August 8, 1975, the corporate name was again changed, to its present name, Memorial Heart Research Foundation." This letter was attached to the public administrator's petition to the court but was not formally admitted into evidence. No other evidence was offered by Memorial, although there was a statement by its counsel that they could find no connection between their association and the decedent.
American Heart Association, on the other hand, did present affirmative evidence that established: (1) on August 31, 1954, it registered the name "HEART FUND" with the United States Patent Office and had timely renewed this registration on August 31, 1974. (2) It emphasized this registered name on its stationery and other printed material distributed to the public (exhibits 2 and 3 attached hereto). Distribution of the entire residue to American Heart Association would clearly satisfy the desires of the decedent as expressed in her will. The same cannot be said for Memorial. The trial court came close to recognizing this fact when it said: "And if I were going to give a gift to the heart fund, I suppose it would go to the American Heart Association."
Respondent claims that appellant did not establish it was "the heart fund," because the registered name is "HEART FUND." We are not persuaded by this argument, nor was the trial court. Mr. Bornstein, attorney for Memorial, stated in court: "Well, the only evidence that I feel can really be put forth by either side, really, is simply that the decedent specified in her will that the residue of her estate was to go to the heart fund, with a small `f' and a small `h.' [¶] Now, all that I can read from that really is that she was intending on making a bequest to some charitable organization carrying on heart and cardiovascular research.[2]. . . .
"THE COURT: You are reading something into the will that is not there. . . . To be honest with you, Mr. Bornstein, I never heard of your organization. I never have seen any advertisements, to my knowledge. Maybe they have been proliferous. I have never seen them. The American Heart Association, and the Heart Fund are well known through advertising and television ads, etc. I have made gifts to them, myself, but I never heard of your organization, and I don't know whether she did either."
We believe the will (exhibit 1) demonstrates that it was not written by an experienced draftsperson or by a person with extensive training in writing and grammar. Clearly, she wanted the residue of her estate to go to the Heart Fund. For the reasons stated above, we are convinced that *Page 492 
American Heart Association was the only claimant to produce evidence that it qualified as such.
Interestingly, American Heart Association disagrees with us that this is a case where the bequest is somewhat ambiguous. It states: "There are not two organizations fitting the description `the heart fund.' There is only one." In this context, American Heart Association is correct, but this was not determined until extrinsic evidence was taken that resolved the issue. In any event, the result is the same.
The judgment is reversed and the case remanded to the trial court so that a new order of distribution can be made consistent with this opinion.
Kaus, P.J., and Ashby, J., concurred.
A petition for a rehearing was denied May 24, 1979, and the petition of the claimant and respondent for a hearing by the Supreme Court was denied July 5, 1979. *Page 493 
[EDITORS' NOTE: EXHIBIT 1 IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 494 
[EDITORS' NOTE: EXHIBIT 2 IS ELECTRONICALLY NON-TRANSFERRABLE.] *Page 495 
[EDITORS' NOTE: EXHIBIT 3 IS ELECTRONICALLY NON-TRANSFERRABLE.]
[1] There is no evidence to support this finding. It is based solely on the opinion of Memorial's counsel (see fn. 2,infra).
[2] Apparently the court relied on this statement for finding No. 4. *Page 496