Opinion
CHIN, J.
This case involves the latest chapter in the litigation spawned by the estate of Beryl H. Buck. In July of 1986, the probate judge who had jurisdiction over the Leonard and Beryl Buck Foundation (the Buck Trust), the charitable trust created by Mrs. Buck’s will, issued an order appointing a successor distribution trustee. The 1986 appointment order provides, among other things, that the successor distribution trustee is to distribute, irrevocably, at least 20 percent of the annual gross income from the Buck Trust to not more than three major projects located in Marin County, the benefits from which will inure not only to Marin County but to all of humankind. No appeal was taken from the 1986 order.
Nevertheless, six years after the 1986 appointment order became final, appellants, a group of five charitable organizations active in Marin County, filed an action collaterally attacking that order. The probate court sustained a demurrer to appellants’ complaint and petition for writ of mandate without leave to amend. The court reasoned that appellants lacked standing to attack the 1986 appointment order and that the action was barred by the doctrine of res judicata.
On appeal, appellants contend they have standing to collaterally attack the 1986 appointment order because they are challenging the probate court’s “jurisdiction” to issue an order which restricts the trustee’s discretion. We conclude that appellants’ action is a substantial evidence challenge in jurisdictional garb. Consequently, we affirm the judgment of dismissal.
I. Facts
Beryl H. Buck died on May 30, 1975, leaving a will establishing the Buck Trust.[1] The will stated that the Buck Trust “shall always be held and used for exclusively non-profit charitable, religious or educational purposes in providing care for the needy in Marin County, California, and for other nonprofit charitable, religious or educational purposes in that county.” In 1979 *1850 the court appointed the San Francisco Foundation as distribution trustee of the Buck Trust and named Wells Fargo Bank and John Elliott Cook (Mrs. Buck’s personal lawyer and friend) as investment cotrustees. Mrs. Buck’s estate was closed in 1980 when the probate court funded the Buck Trust with approximately $260 million.[2] At that time the probate court specifically reserved jurisdiction over the Buck Trust.
A.
Approximately four years after it was appointed distribution trustee, the San Francisco Foundation filed a modification petition in the Marin County probate court seeking permission to spend a portion of the Buck Trust income outside the borders of Marin County. In essence, the petition asked the court to apply the cy prés doctrine because the size of the Buck Trust income and the relative affluence of Marin County made “it. . . impracticable and inexpedient to continue to expend all of the income from the Buck Trust solely within Marin County.”
In response to the petition for modification, John Elliott Cook, Marin County, and the Marin Council of Agencies filed a petition to remove the San Francisco Foundation as distribution trustee. In addition, the probate court permitted numerous parties to intervene in the action. Ultimately, two of the parties to the litigation—the San Francisco Foundation and a group of forty-six charities—sought to modify the trust by removing the Marin-only restriction, while five—the Attorney General, Marin County, Marin Council of Agencies, John Elliott Cook, and Wells Fargo Bank—opposed the petition for modification.
The petition for modification and the petition for removal of trustee were tried before the court beginning in February of 1986. After a six-month trial, the probate court issued a one hundred thirteen-page statement of decision. In its written decision, the probate court refused to apply the cy prés doctrine to modify the Marin-only restriction. The court reasoned that all of the Buck Trust income could be spent effectively and efficiently in Marin County. Moreover, the court found that the geographic restriction in the Buck Trust was “unequivocal.”
Nevertheless, the probate court found that Mrs. Buck intended that the benefits of expenditures made in Marin County “would and should extend beyond Marin’s borders.” According to the probate court, the breadth of purposes allowed in the Buck Trust also permitted the trustee to fund “major projects” in Marin County. Such major projects might include a social policy *1851 institute, an environmental research center, or a center on aging. Consequently, the statement of decision specifically provided that “Buck Trust fimds may, in accordance with the terms of the Trust, be spent on projects and purposes, the benefits of which extend beyond Marin County, so long as the funds are spent in Marin County.”
On August 15, 1986, the probate court filed its statement of decision and a separate judgment denying the San Francisco Foundation’s petition for modification. However, the judgment did not address the petition to remove the San Francisco Foundation as distribution trustee. That action was resolved by a settlement agreement described below. To date, no party has challenged the August 15, 1986, judgment by appeal or collateral attack.
B.
Both before and during trial on the modification petition, the parties engaged in ongoing settlement negotiations. These negotiations were orchestrated by the Honorable Homer B. Thompson, a Santa Clara County trial judge assigned by the Supreme Court to preside over the Buck Trust litigation. Initial efforts at settlement were unsuccessful. However, late in the trial the San Francisco Foundation surprised Judge Thompson and the other parties by offering to resign as distribution trustee, provided it could recover its attorney fees. This offer led to two related settlement agreements.
The first settlement agreement was between the San Francisco Foundation, Marin County, the Attorney General, and the Marin Council of Agencies. In this settlement agreement, the San Francisco Foundation agreed to resign as distribution trustee, and Marin County and the Marin Council of Agencies agreed to petition the probate court to appoint a new entity (the Marin Community Foundation) as successor trustee. All parties agreed that the San Francisco Foundation could recover its reasonable attorney fees and costs as determined by the court!
The second settlement agreement was between the Attorney General, Marin County, and the Marin Council of Agencies. In that agreement the parties established a procedure for selecting the governing board of the successor trustee (the Marin Community Foundation) and for monitoring its administration of the Buck Trust. The parties also agreed to petition the probate court for an order requiring the successor trustee to set aside a significant portion of the Buck Trust income to fund one to three “major projects” in Marin County. The major projects were to be of national and international importance and would benefit all humankind.
C.
Subsequently, Judge Thompson granted the San Francisco Foundation’s petition to resign as distribution trustee and also granted a joint petition by *1852 Marin County, the Marin Council of Agencies, and the Attorney General to appoint the Marin Community Foundation as successor trustee. The order appointing the successor trustee was filed on July 31, 1986 (the 1986 appointment order). That order incorporated the terms of the settlement reached by the parties and, in particular, provided “[t]hat the successor Distribution Trustee shall permanently and irrevocably allocate and distribute at least 20%[3] of the annual gross income of the Buck Trust to be devoted to a major project or projects (not to exceed three) located only in Marin County, the benefits from which will inure not only to Marin County but to all of humankind; that to the extent practical, such project or projects shall address subjects in which Beryl Buck had an interest during her lifetime and shall be consistent with her desire to bring respect and admiration to Marin County; that such allocation and distribution of a portion of the annual gross income of the Buck Trust shall commence July 1, 1987 . . . ; and that this funding commitment shall not be reduced except with Court approval in the case of a catastrophic disaster which requires immediate and substantial relief for the residents of Marin County.” The order provided that the Marin Community Foundation “should agree to adhere to these principles” as a condition of accepting appointment as successor trustee. No appeal was taken from the 1986 appointment order.
The 1986 appointment order did not name the major projects to be funded, but instead provided that the probate court would select the major projects based on a future evidentiary hearing. All parties to the cy pres action and the successor trustee were invited to present proposed projects at the hearing.
The major project selection hearing was held in the summer of 1987, and on August 7, 1987, Judge Thompson selected three projects for funding: the Buck Center for Research in Aging, the Marin Institute for the Prevention of Alcohol and Other Drug Problems, and the Beryl Buck Institute for Education. The selection order was not appealed. From 1987 to 1991, the three major projects named above received a total of $27.3 million in Buck Trust funding. All three projects are now established charitable concerns. Although the major projects do receive some outside contributions, they are all heavily dependent on Buck Trust funding.[4]
*1853 D.
As indicated, no one appealed the 1986 appointment order. Nevertheless, on September 4, 1992—over six years after the 1986 appointment order was issued—appellants filed a complaint and petition for writ of mandate[5] collaterally attacking that order. In this pleading appellants alleged they were challenging “the jurisdictional validity” of that part of the 1986 appointment order that set aside a portion of the Buck Trust income for the major projects. In particular, appellants claimed the probate court had wrongfully divested the distribution trustee of its power to select beneficiaries, to specify the conditions and amount of distribution, and to terminate distributions to a particular beneficiary. Appellants also alleged that the major projects provision “constitute[s] an unlawful and void modification of the terms of Beryl Buck’s will and trust instruments.”
After appellants made several unsuccessful attempts to avoid having their collateral attack heard by Judge Thompson (who had been reassigned to hear all proceedings in connection with the Buck Trust litigation), respondents Marin Community Foundation and Wells Fargo Bank filed their general demurrer to the complaint and petition for writ of mandate. Judge Thompson sustained the demurrer without leave to amend, finding that appellants lacked standing to commence the proceeding and that the collateral attack was barred by res judicata. On June 23, 1993, Judge Thompson entered a judgment of dismissal in favor of all defendants. This timely appeal followed.
II. Discussion
A.
Appellants contend the probate court erred when it found they lacked standing to maintain their action attacking the 1986 appointment order. According to appellants, their first cause of action (which has been styled as an action for declaratory relief) raises a “jurisdictional challenge” to the 1986 appointment order. Appellants correctly point out that if the order shows on its face that the court had no “jurisdiction” to make the order, then the order is void, and the defect may be raised at any time by any person. (Texas Co. v. Bank of America etc. Assn. (1935) 5 Cal.2d 35, 41 [53 P.2d 127].)
*1854 Appellants essentially concede that their declaratory relief action is a collateral attack on a final judgment.[6] A litigant may collaterally attack a final judgment for lack of personal or subject matter jurisdiction, or for granting relief that the court had no power to grant, but may not collaterally attack a final judgment for nonjurisdictional errors. (Adoption of Matthew B. (1991) 232 Cal.App.3d 1239, 1268-1269 [284 Cal.Rptr. 18]; see also Barquis v. Merchants Collection Assn. (1972) 7 Cal.3d 94, 119-120 [101 Cal.Rptr. 745, 496 P.2d 817]; Estate of Buckley (1982) 132 Cal.App.3d 434, 446 [183 Cal.Rptr. 281]; Jones v. World Life Research Institute (1976) 60 Cal.App.3d 836, 840, 844 [131 Cal.Rptr. 674].) “Tf a judgment, no matter how erroneous, is within the jurisdiction of the court, it can only be reviewed and corrected by one of the established methods of direct attack.’ [Citation.]” (People v. $6,500 U.S. Currency (1989) 215 Cal.App.3d 1542, 1548 [264 Cal.Rptr. 294], italics added.) Thus, “[t]he key question in the case at bench is whether the [alleged] error, appearing on the face of the judgment, [would] render[] the judgment void ... as being beyond the jurisdiction of the court, and subject to collateral attack, or [would] simply render[] the judgment erroneous—not void—but within the jurisdiction of the court, and free from collateral attack.” (Jones, supra, at p. 844.)
Although the parties agree that a final judgment is subject to collateral attack only for jurisdictional defects, they sharply disagree on the definition and scope of “jurisdiction” in this context.
Respondents’ position is easily summarized. They contend that, for the purpose of collateral attack on a final judgment, jurisdiction is limited to (1) jurisdiction of the subject matter (here the trust), (2) personal jurisdiction over the parties, and (3) adequate notice.[7] (See Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at pp. 119-120; Estate of Buckley, supra, 132 Cal.App.3d at p. 446.) Moreover, respondents point out that appellants have *1855 not and cannot allege that the 1986 appointment order lacked jurisdiction in this fundamental respect. The 1986 appointment order and related court records demonstrate that the probate court retained jurisdiction over the Buck Trust, that it had jurisdiction over all parties, and that notice was given to all interested persons. Appellants do not contend otherwise. Thus, respondents maintain that because the probate court had “fundamental jurisdiction”—that is, jurisdiction of the subject matter and parties[8]—the 1986 appointment order is immune from collateral attack by appellants or any other person. (See Barquis, supra, at p. 120, fn. 24; Pacific Mut. Life Ins. Co. v. McConnell (1955) 44 Cal.2d 715, 725 [285 P.2d 636].)
Not surprisingly, appellants argue for a broader definition of “jurisdiction” in this context. They point to cases where the courts have held that “ ‘Collateral attack is proper to contest [a judgment void on its face for] lack of personal or subject matter jurisdiction or the granting of relief which the court has no power to grant [citations omitted].’ [Citations.]” (Becker v. S.P.V. Construction Co., supra, 27 Cal.3d at p. 493, underscored italics added, brackets added by the Becker court, quoting Armstrong v. Armstrong (1976) 15 Cal.3d 942, 950 [126 Cal.Rptr. 805, 544 P.2d 941]; see also Adoption of Matthew B., supra, 232 Cal.App.3d at p. 1268; Jones v. World Life Research Institute, supra, 60 Cal.App.3d at pp. 840-848; Tonningsen v. Odd Fellows’ Cem. Assn. (1923) 60 Cal.App. 568, 573 [213 P. 710].) Here, appellants contend their collateral attack is proper, even though the probate court had jurisdiction in the fundamental sense, because they are challenging a grant of “ ‘relief which the trial court ha[d] no power to grant.’ ” However, this aspect of jurisdiction, if it exists at all,[9] has been narrowly limited by the courts. In our view, appellants simply do not challenge the court’s power to issue the 1986 appointment order; properly understood, appellants’ complaint/petition merely alleges an erroneous exercise of that power. (See Adoption of Matthew B., supra, at p. 1268.)
There are few cases where the courts have permitted a collateral attack based on factors other than a lack of “fundamental” jurisdiction. In Becker v. S.P.V. Construction Co., supra, 27 Cal.3d 489, the Supreme Court permitted a collateral attack where the amount awarded in a default judgment exceeded the amount requested in the complaint. The court relied on a specific statutory provision (Code Civ. Proc., § 580) which prohibits a court from entering a default judgment awarding damages in excess of the amount demanded in the complaint. The court suggested that such a defective default judgment was subject to collateral attack because the court “has no power” *1856 to enter a default judgment except in conformity with Code of Civil Procedure section 580.[10] (Becker, supra, at p. 493.)
The only other recent case that permitted a collateral attack in the absence of a “fundamental” jurisdictional defect is Jones v. World Life Research Institute, supra, 60 Cal.App.3d 836.[11] In Jones, the court held that a court had no power to grant prejudgment interest in a stipulated judgment because this was contrary to statute and to the stipulation that supported the judgment. (Jones, supra, at pp. 842-844, 847-848.) The Jones court was careful to explain that “the distinction between jurisdictional error and nonjurisdictional error depend[s] on whether the nature or type of relief granted is completely outside the scope of the court’s jurisdiction to grant, or is simply that of a grant of relief that is excessive but still of the nature and type of relief that is within the jurisdiction of the court to grant.” (Id., at p. 845.)
Here, appellants are not contending that the major projects provision in the 1986 appointment order was “completely outside the scope of the court’s jurisdiction to grant . . . .” (Jones v. World Life Research Institute, supra, 60 Cal.App.3d at p. 845.) Instead, they contend that the court “substantially [and improperly] modified the terms of the Buck Trust in the guise of conditions imposed by the Court upon the successor trustee.” However, appellants do not and cannot contend that the probate court lacked power to modify the trust. As appellants’ own authorities show, such power is well established where there are “[u]nusual or emergent circumstances . . . .” (Estate of Gilliland (1974) 44 Cal.App.3d 32, 37 [118 Cal.Rptr. 447].)[12]
*1857 The error appellants assert, properly understood,[13] is not that the court lacked jurisdiction to alter the terms of the trust, but that the probate court did so without substantial evidence to support the unusual or emergent circumstances that would justify modification.[14] However, insufficiency of the evidence, like an abuse of discretion or mistake of law, is a “nonjurisdictional error[] for which collateral attack will not lie. [Citation.]” (Armstrong v. Armstrong, supra, 15 Cal.3d at p. 950.) “Having jurisdiction of the subject matter and of the parties, the order qf the court, whether correct or not, became res judicata” on the issue of the major project funding. (Estate of Keet (1940) 15 Cal.2d 328, 334 [100 P.2d 1045].)
Finally, appellants rely on cases, all of which arose on direct appeal, which use language suggesting that a court has no “power” or “jurisdiction” to modify a trust in the absence of evidence supporting the modification. (Estate of Gilliland, supra, 44 Cal.App.3d at pp. 36-38 [probate court order timely appealed]; Stanton v. Wells Fargo Bank etc. Co. (1957) 150 Cal.App.2d 763,765, 770 [310 P.2d 1010] [order timely appealed]; Estate of Bodger (1955) 130 Cal.App.2d 416, 418, 420, 426 [279 P.2d 61] [probate court order timely appealed].) However, the courts in those cases did not use the terms “power” or “jurisdiction” in the context of a collateral attack. As our Supreme Court has cautioned on many occasions, “the term ‘jurisdiction’ carries a variety of meanings . . . .” (Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at p. 120, fn. omitted.) Appellants’ reliance on the cases just cited “reveals a failure to appreciate the distinctions between different levels of ‘jurisdictional’ defects.” (Ibid.) The courts’ finding in Bodger, Gilliland, and Stanton that the court had no “power” or “jurisdiction” to enter a particular order was “not the equivalent of a finding of a lack of jurisdiction in the fundamental sense so as to render any final judgment ‘void’ and subject to collateral attack.” (Barquis, supra, at p. 120.) In short, appellants’ argument is based on semantics, not logic.[15]
*1858 In sum, we conclude that appellants may not maintain their collateral attack because it alleges a nonjurisdictional error.[16]
B.
Appellants next contend that even if they cannot maintain their declaratory relief action, they nevertheless have standing to prosecute their petition for writ of mandate. They are wrong.
We note first that appellants have not explained why the petition for writ of mandate is any less a collateral attack on a final judgment than their cause of action for declaratory relief.[17] Since the writ petition, like the declaratory relief action, does not allege a jurisdictional defect, it may not be used to attack a final judgment collaterally.
But even if we assume that the writ petition is something other than a collateral attack, it seeks relief that is simply not available by way of a writ of mandate. Appellants cite In re Veterans’ Industries, Inc. (1970) 8 Cal.App.3d 902 [88 Cal.Rptr. 303] as authority for their writ petition. In Veterans’ Industries, a charitable organization sought to dissolve and to distribute its assets to another charitable organization (Community Rehabilitation). (Id., at pp. 910-911.) Disabled American Veterans and Purple Heart (objectors) filed objections to the disposition of the assets to Community Rehabilitation on the ground that such disposition did not comport with the primary charitable purposes for which the assets had been held. (Id., at pp. 911, 913-914.) The trial court granted the Attorney General’s motion to strike these objections on the ground that the Attorney General is the proper legal representative of the beneficiaries of charitable trusts and that the objectors had no standing to object or intervene in the dissolution and distribution action. (Id., at p. 914.)
*1859 However, the record in Veterans’ Industries also reflected that the Attorney General and superior court believed—incorrectly—that they had no power to recommend or appoint another distributee. (In re Veterans’ Industries, Inc., supra, 8 Cal.App.3d at pp. 914-915, 919-920.) Consequently, neither the Attorney General nor the court exercised its discretion on this issue. Although the Court of Appeal found that the objectors had no standing to intervene in the action (id., at p. 924), the reviewing court held that the objectors had standing to bring a petition for writ of mandamus to compel the Attorney General and superior court to exercise their discretion (id., at pp. 926-927). Significantly, Veterans’ Industries cited Hollman v. Warren (1948) 32 Cal.2d 351, 355 [196 P.2d 562], for the proposition that while “ordinarily . . . mandamus [is] not available to compel the exercise by a court or officer of the discretion possessed by them in a particular manner, or to reach a particular result, it does lie to command the exercise of discretion—to compel some action upon the subject involved. [Citations.]” (Id., at p. 355, partially quoted in Veterans’ Industries, supra, at p. 926.)
By contrast, in the present case, appellants’ petition for writ of mandate does not seek to compel the Attorney General or any other party merely to exercise discretion. Indeed, it appears that the Attorney General exercised its discretion when it agreed to the settlement creating the major projects. Instead, the petition for writ of mandate, at best, challenges the manner in which the Attorney General exercised its discretion.[18] Consequently, appellants’ petition for writ of mandate is simply not supported by the reasoning of Veterans’ Industries.
The judgment is affirmed. Costs to respondents.
White, P. J., and Jenkins, J.,* concurred.
A petition for a rehearing was denied November 15,1994, and appellant’s petition for review by the Supreme Court was denied January 4, 1995. Werdegar, J., did not participate therein.

Since we are reviewing the sufficiency of a pleading against a general demurrer, “ ‘[w]e treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed.’ [Citation.]” (Blank v. Kirwan (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58], quoting Serrano v. Priest (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) Here, the statement of facts is based on the complaint/petition and judicially noticeable court records in prior actions. (See Evid. Code, § 452, subd. (d).)

By June 30, 1993, the value of the trust corpus had grown to approximately $563 million.

A footnote at this point provided: “During the first year (fiscal year 1987-88) the commitment shall amount to 25% of the gross income from the Buck Trust and for the four years thereafter said commitment shall decrease one percent per year to the level of 20% per year thereafter in perpetuity.”

During the 1992-1993 fiscal year, Buck Trust income accounted for nearly 89 percent of the funding for the Buck Center for Research in Aging, 72 percent of the funding for the Beryl Buck Institute for Education, and 60 percent of the funding for the Marin Institute for Prevention of Alcohol and Other Drug Problems.

The pleading was styled as “Complaint for Declaratory Relief and Alternatively, Petition for Writ of Mandate/Prohibition.”

Even an untimely motion to set aside a default judgment is considered a collateral rather than direct attack. (Becker v. S.P.V. Construction Co. (1980) 27 Cal.3d 489, 492-493 [165 Cal.Rptr. 825, 612 P.2d 915].) Here, although the complaint is styled as one for declaratory relief, the clear purpose of the action is to set aside a portion of the 1986 appointment order. The prayer for relief asks the court to declare the order “unlawful and void to the extent. . . that it ordered the creation of the ‘major projects’ and forced the successor trustee to fund them in perpetuity . . . .” Regardless of labels, there is no question that the current action is a collateral attack on the 1986 appointment order.

To avoid confusion, we hereafter refer to the presence of these three elements as “fundamental jurisdiction.” (See Estate of Buckley, supra, 132 Cal.App.3d at p. 446.) “[T]he term ‘jurisdiction’ *. . . has so many different meanings that no single statement can be entirely satisfactory as a definition. . . . Lack of jurisdiction in its most fundamental or strict sense means an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties. . . .’ ” (Brock v. Superior Court (1947) 29 Cal.2d 629, 631 [177 P.2d 273, 170 A.L.R 521], quoting Abelleira v. District Court of Appeal (1941) 17 Cal.2d 280, 287-288 [109 P.2d 942, 132 A.L.R. 715].)

See footnote 7, ante, at page 1854.

See discussion in Jones v. World Life Research Institute, supra, 60 Cal.App.3d at page 845.

However, Becker might also be interpreted as permitting a collateral attack for lack of proper notice. (See Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at p. 120, fn. 25.) As the Becker court observed, “ ‘[i]f a judgment other than that which is demanded is taken against him, [the defendant] has been deprived of his day in court—a right to a hearing on the matter adjudicated.’ [Citations.]” (Becker v. S.P.V. Construction Co., supra, 27 Cal.3d at p. 493, quoting Burtnett v. King (1949) 33 Cal.2d 805, 808 [205 P.2d 657, 12 A.L.R.2d 333].)

A third case—County of Ventura v. Tillett (1982) 133 Cal.App.3d 105 [183 Cal.Rptr. 741]—held that a stipulated judgment to repay welfare funds requires ajudicial determination that the defendant waived her constitutional rights before agreeing to the stipulation. The Tillett court held that a stipulated judgment is void—and thus subject to collateral attack—if the required judicial determination is not made. (Id., at pp. 112-115; County of Los Angeles v. Castro (1984) 160 Cal.App.3d 899, 903 [207 Cal.Rptr. 15].) However, the Supreme Court disapproved Tillett on this point in County of Los Angeles v. Soto (1984) 35 Cal.3d 483, 492, footnote 4 [198 Cal.Rptr. 779, 674 P.2d 750], (See also County of Los Angeles v. Castro, supra, at p. 903.)

“ ‘The power of a court of equity to permit or direct a deviation from the terms of the trust is at least as extensive in the case of charitable trusts as it is in the case of private trusts. The courts will direct or permit a deviation from the terms of the trust where compliance is impossible or illegal, or where owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of *1857 the purposes of the trust.’ [Citation.]” (Estate of Gilliland, supra, 44 Cal.App.3d at p. 37, quoting 4 Scott on Trusts (3d ed. 1967) § 381, p. 2983.)

Appellants suggest we must deem their challenge to be jurisdictional for the purpose of demurrer because they have described it as such in their complaint. However, as we explained previously, although we must accept the truth of the facts alleged in the complaint, we need not accept appellants’ alleged conclusions of law. (Blank v. Kirwan, supra, 39 Cal.3d at p. 318.)

We are not convinced that the 1986 appointment order modified the terms of the Buck Trust or that, if it did so, it was not supported by substantial evidence. Nevertheless, for the purpose of reviewing the demurrer, we will assume that the order constituted a modification.

Appellants are not alone in their failure to distinguish between different levels of jurisdictional defects. Our Supreme Court has bemoaned “an unfortunately common failure of early decisions to distinguish between different levels of ‘jurisdictional’ defects. [Citations.]” (Barquis v. Merchants Collection Assn., supra, 7 Cal.3d at p. 122, fn. 27.) This failure makes *1858 arguments like the present one semantically possible, but does not render them logically plausible.

Moreover, even were we to assume that the alleged defect in the 1986 appointment order were jurisdictional, we would still be inclined to affirm the judgment. “Where some of the parties have relied on, or changed their position in accordance with the former judgment, a court may deny collateral attack. [Citations.]” (Armstrong v. Armstrong, supra, 15 Cal.3d at p. 951.) The major projects appear as respondents in this appeal and are parties to the Buck Trust litigation. Here, the record indicates that the major projects have acted in reliance on the 1986 appointment order by hiring staff and making other commitments based on the promise of continued Buck Trust funding. (See statement of facts, ante, at p. 1852.)

In pertinent part, the petition for writ of mandate states that “[d]efendants, as trustees under the relevant will and trust instruments . . . , have a clear, present, and mandatory duty to act in accordance with the original language of those instruments . . . and not in accordance with those portions of the July 31, 1986 Order establishing the ‘major projects’ scheme . . . .”

Moreover, as respondents point out, the petition seems directed at the trustees, not the Attorney General or any other officer.

 Judge of the Alameda Superior Court sitting under assignment by the Chairperson of the Judicial Council.